In the Matter of the Application
for Water Rights,

Applicant–Appellant: READY MIXED
CONCRETE COMPANY IN
ADAMS COUNTY,

v.

Objectors–Appellees: FARMERS RESER-
VOIR AND IRRIGATION COMPANY,
State and Division Engineer, City of
Thornton, the Irrigationists Association,
Central Colorado Water Conservancy
District, the Ground Water Management
Subdistrict of the Central Colorado Wa-
ter Conservancy District, and Denver
Water Department.

No. 04SA285.

Supreme Court of Colorado,
En Banc.

June 13, 2005.

As Modified on Denial of Rehearing
July 18, 2005.

Fowler, Schimberg & Flanagan, P.C., Timothy J. Flanagan, Denver, for Applicant–Appellant.

John P. Akolt, III, Brighton, for Objector–Appellee Farmers Reservoir and Irrigation Company.

John W. Suthers, Attorney General, Susan Schneider, Assistant Attorney General, Natural Resources Section, Denver, for State Engineer & Division Engineer for Water Division 1.

Margaret A. Emerich, City Attorney, City of Thornton, Dennis A. Hanson, Assistant City Attorney, Thornton, for Objector–Appellee City of Thornton.

Carlson, Hammond & Paddock, L.L.C., Mary Mead Hammond, Amy N. Huff, Denver, for Objector–Appellee Irrigationists Association.

Lind, Lawrence & Ottenhoff, Kelly J. Custer, Greeley, for Objectors–Appellees Central Colorado Water Conservancy District and the Ground Water Management Subdistrict of the Central Colorado Water Conservancy District.

Michael L. Walker, Denver, for Objector–Appellee Denver Water Department.

HOBBS, Justice.

This appeal is from a judgment of the District Court for Water Division No. 1 denying the application of Ready Mixed Concrete Company under section 37–92–302(1)(a), C.R.S. (2004), to quantify and change the McCanne Ditch water right for use by augmentation. By a motion for summary judgment, which the water court denied, Ready Mixed Concrete claimed entitlement under a 1918 decree to 900 acre-feet of fully consumable "developed water" for its use. The water court construed the 1918 referee's report and resulting decree as recognizing a native South Platte water seepage right for irrigation use on 300 acres of land in the vicinity of the South Platte River. When Ready Mixed Concrete failed to bear its burden of proving the historical use of the irrigation right over a representative period of time, the water court dismissed the change application.

We affirm the water court's judgment. The plain language of the 1918 decree and the accompanying referee's report demonstrate that the McCanne Ditch water right takes its source in tributary South Platte River water for irrigation on 300 acres of land. The water court correctly dismissed the change of water right application when Ready Mixed Concrete failed to carry its burden of proving the historical consumptive use measure of the water right for change purposes.[1]

## I.

Commenced in 1892, the McCanne Ditch extended for six and a half miles in length upon completion in 1893. According to the 1918 decree and accompanying referee's report, the ditch collected water from "springs percolating, drainage and seepage water gathered along the first three miles of its course." Beginning in 1894, the collected water was conveyed and placed to irrigation on 300 acres of land. The 1918 decree recog-

---

1. The applicant presents two issues on appeal:
   (1) Whether a direct flow priority of developed water decreed in 1918 "independent of the priorities" of the South Platte River may be reduced in volume when changed from irrigation to augmentation use.

   (2) Conversely, may other water right owners collaterally attack a valid seepage decree after 85 years of open and notorious usage?

nizes an appropriation date of March 16, 1892, a rate of flow of 4.0 cubic feet per second for irrigation use on 300 acres, not to exceed 900 acre-feet of water annually. The decree requires the water remaining after irrigation to be returned to the South Platte River system directly or by percolation through the soils.

Ready Mixed Concrete owns and operates several gravel pits located on the lands that the McCanne Ditch historically served. It holds all the shares of the McCanne Ditch and Reservoir Company, a mutual ditch company, which owns the water right.

Ready Mixed Concrete filed the change case so that it might store water under the McCanne Ditch priority in a newly excavated gravel pit, Edgar Pond, and release it to the South Platte River as necessary to replace evaporation depletions injurious to other rights from gravel pits the company operates.

Pursuant to section 37–92–302(1)(b), C.R.S. (2004), several parties ("Objectors") filed statements of opposition.[2] They claimed the application, if granted, would alter historic stream conditions as they had existed under the decreed irrigation use for McCanne Ditch water. Because the case involved judicial construction of the 1918 decree, the application was re-referred to the water judge.

Ready Mixed Concrete sought summary judgment claiming 900 acre-feet annually of fully consumable developed water for use by augmentation or replacement, free of the river's call. The water court denied summary judgment, ruling that:

1. The water subject to this Application is *salvaged* water.

2. Pursuant to the 1918 Decree, Applicant's diversion is not subject to a senior call.

3. Notwithstanding the 1918 decree, the quantity of water diverted by the Applicant, in excess of Applicant's historical consumptive use, is subject to the prior appropriation doctrine.

4. Opposers are not collaterally estopped from litigating the question of historical consumptive use.

5. Abandonment by the Applicant of any portion of its 1918 Decreed rights is a question of fact to be determined at trial.

6. There is no genuine dispute regarding the Applicant's ownership of shares in the McCanne Ditch.

In accordance with section 37–92–305(3)–(4), C.R.S. (2004), the case proceeded to trial for quantification of historical beneficial consumptive use and establishment of return flow patterns and protective conditions for other water rights under which the change decree might issue.

The water court made the following findings:

1. The probable source of the water collected by the McCanne Ditch was return flows attributable to the irrigation of lands lying above the McCanne Ditch, which lands were supplied by the Fulton Ditch.

2. The South Platte River is an "over-appropriated" river. The effect of such over-appropriation is that if the historical use attributable to a water right is expanded by increased consumptive use or failure to maintain historical return flows, the vested rights of other appropriators on the South Platte River will be adversely affected.

3. The source of supply for McCanne Ditch is springs, drainage, and seepage water gathered along the first three miles of the ditch. Seepage losses along the carrying section of the ditch are significant. The McCanne Ditch does not divert from the South Platte River itself.

4. No irrigation has been made of the McCanne Ditch decree since at least 1974. From 1976 to the present the McCanne Ditch decree has been used

**2.** Farmers Reservoir and Irrigation Company, State and Division Engineer, City of Thornton, the Irrigationists Association, Central Colorado Water Conservancy District, the Ground Water Management Subdistrict of the Central Colorado Water Conservancy District, and Denver Water Department filed statements of opposition.

to generate augmentation credits by the Central Colorado Water Conservancy District (as previous owner and as lessee).

5. There is insufficient evidence of any actual irrigation on the farm land presented by Ready Mixed during any period, including the study period of 1917–1974.

The water court then dismissed the change application because Ready Mixed Concrete failed to meet its burden of proof to demonstrate historical consumptive use of the McCanne Ditch water right over a representative period of time.

Ready Mixed Concrete claims that the 1918 decree and accompanying referee's report recognized a water right for 900 acre-feet of fully consumable developed water free of the river's call. We disagree, and affirm the water court's judgment dismissing the change of water right application.

## II.

We hold that the plain language of the 1918 decree and the accompanying referee's report demonstrate that the McCanne Ditch water right is for tributary South Platte Basin water used for irrigation on 300 acres of land. The water court correctly dismissed the change application when Ready Mixed Concrete failed to carry its burden of proof to demonstrate the historical consumptive use measure of the water right for change purposes.

### A.   Standard of Review

■■■■ Judicial construction of a water decree and the accompanying referee's report is a matter of law we review de novo. *Orchard City Irrig. Dist. v. Whitten*, 146 Colo. 127, 133–34, 361 P.2d 130, 133 (1961). In construing the decree, we must deduce its

meaning, not from detached parts thereof, but from the whole instrument. *Drach v. Isola*, 48 Colo. 134, 141–42, 109 P. 748, 751 (1910).

■ A water right decree confirms pre-existing rights; it does not create or grant any rights, but serves as evidence of rights previously acquired by appropriation of unappropriated water. *Shirola v. Turkey Canon Ranch Ltd. Liab. Co.*, 937 P.2d 739, 748 (Colo.1997); *Cresson Consol. Gold Mining & Milling Co. v. Whitten*, 139 Colo. 273, 283, 338 P.2d 278, 283 (1959).

■ The 1918 McCanne Ditch decree was for irrigation use of seepage waters. Colorado water law contains a presumption that all waters are tributary to a natural stream and subject to the constitutional right of prior appropriation. *DeHaas v. Benesch*, 116 Colo. 344, 351, 181 P.2d 453, 456 (1947). See *Nevius v. Smith*, 86 Colo. 178, 182, 279 P. 44, 45 (1929); *Comstock v. Ramsay*, 55 Colo. 244, 256–57, 133 P. 1107, 1111 (1913). Any party seeking to establish that any waters are not tributary has the burden of proving that fact. *DeHaas*, 116 Colo. at 350, 181 P.2d at 456.

■ Water seeping from other ditches and from irrigation of lands is presumed to belong to the river system and is subject to appropriation and administration in order of priority. This was established Colorado law before entry of the 1918 McCanne Ditch decree. Flowing water, even diffuse runoff and seepage that is not in a defined channel, is presumed to be tributary to the river system. *Comstock*, 55 Colo. at 256, 133 P. at 1111; *see also Nevius*, 86 Colo. at 181–82, 279 P. at 45.

By the close of the Nineteenth Century, agricultural ditches interlaced the South Platte Basin along Colorado's Front Range and downstream to Nebraska.[3]  Constructed

3.  An 1894 United States Government report by a leading national irrigation expert commented on the overbuilt capacity of the South Platte ditch systems in relation to the availability of water to fill them even in normal years, let alone times of drought:

The earliest large enterprise conducted by English speaking farmers was probably the irrigation system at Greeley built by the Union Colo-

ny, work being begun about 1870. As the population of the state has increased and the demand for agricultural products has become greater, farmers have gradually brought under cultivation strips or patches of arable land wherever water can be diverted to cover it at moderate expense. Thus all the easily available sources of water have been utilized, and with increase in the number of farmers still

independently of each other and operating with differing priorities, downstream ditches often depended for a portion or all of their supply upon return flow water percolating into groundwater from ditch seepage and field irrigation or returning overland to the river via drainage ditches or "wasteways."

In *Comstock*, we recognized basic laws of hydrology and human nature fundamental to a system of community water law adopted by the people of Colorado in their constitution, statutes, and case decisions governing allocation, use, and administration of this often critically-short and most-necessary natural resource. 55 Colo. 244, 133 P. 1107.

First, we took judicial notice "of the fact that practically every decree on the South Platte River, except possibly only the very early ones, is dependent for its supply, and for years and years has been, upon return, waste and seepage waters." *Id.* at 254, 133 P. at 1110.

Second, we reiterated that Colorado's prior appropriation law is "first in time first in right." To allow junior appropriators to intercept with impunity return flows of any type upon which senior appropriations depend would result in a "last in time first in right" doctrine. *Id.* at 253–54, 133 P. at 1110.

Third, we observed that the irrigators themselves had devised a highly effective system of water reuse by placing return flow waters to beneficial use time and again, but the appropriation doctrine must govern relative priorities among these users so that "the conditions substantially maintained upon the stream [remained] as they were when the appropriations were made." *Id.* at 257, 133 P. at 1111.

Fourth, we articulated the principle that waters remaining after applying them to a decreed use belong once again to the river system at "[t]he moment they are released by the user . . . and start to flow back to the river." *Id.* at 256, 133 P. at 1111.

Fifth, we held that appropriation of such return flow waters "cannot be lawfully di-

verted from their course to [the river] by independent appropriation, to the injury of those having decreed priorities therefrom." *Id.*

## B. Judicial Construction of the McCanne Ditch Decree

When we turn to the plain language of the 1918 McCanne Ditch decree and the accompanying referee's report, we find that they address seepage water and its use for irrigation of 300 acres of land. Under the decree, the return flow from this use is part of the river system for use under the water rights of others. Accordingly, the water court was correct in denying the claim of Ready Mixed Concrete for a change decree in the amount of 900 acre-feet of water fully consumable for augmentation or replacement purposes.

Under the decree, as documented in the referee's report, the owners of the McCanne Ditch have a right to use water supplied by "springs percolating, drainage and seepage water gathered along the first three miles" of the ditch. This water right is limited to "the amount of water necessary for the irrigation of 300 acres of land now irrigated by it, not exceeding 900 acre-feet per year, and not exceeding the flow of 4 cubic feet per second." Any amount of water the ditch collects that is "greater than what is necessary under the present method of use to maintain said flow and needs as herein established and limited, shall be delivered into the South Platte River . . . . So limited said decree is independent of other priorities in said Water District."

The referee's report plainly states that collected water decreed to the ditch derives from irrigation of other lands in the South Platte Basin using South Platte River system water. If not intercepted, this collected water would percolate to tributary groundwater or return to the stream overland by surface accumulation and flooding:

A portion of the water it collects, (though not the portion here awarded for irrigation), would, if not intercepted, eventually,

more land has been cultivated until the area far exceeds that which can be irrigated in ordinary seasons.

F.H. Newell, *Report on Agriculture by Irrigation in the Western Part of the United States at the Eleventh Census: 1890* at p. 91 (1894).

by accumulation reach the river by flooding over the surface or by underground escape. This water ... was originally asserted to be derived from springs and seepage. This seepage comes from lands of greater elevation irrigating from ditches taking their supply from the South Platte river.

The referee's report also recites that running the water through the unlined McCanne Ditch and onto the irrigated fields itself resulted in significant return flows to the river. In addition to all of this evidence of the tributary nature of the water source, the plainest statement of the decree's intent is the requirement that "[a]ny amount gathered by said Ditch greater than what is necessary under the present method of use to maintain said flow and needs as herein established and limited, shall be delivered to the South Platte River." The "method of use" referred to by the referee is collection of the water by the ditch and field irrigation using this water; the "need" referred to is crop production; the "limitation" referred to is the requirement of returning to the river all water not needed for crop production.

Taking all of the decree provisions together, we must construe them contrary to the developed water theory Ready Mixed Concrete argues. The referee's report and the decree are explicit that the decreed use of the McCanne Ditch water is for irrigation of 300 acres of land, not to exceed 900 acre-feet per year. It appears that the referee found that loss of water back to the stream from conveyance and irrigation through porous soil near the river was so great as to warrant the application of three acre-feet of water to every acre of land to grow a crop, and included the 900 acre-foot volumetric limitation as a condition to prohibit wasteful irrigation of the 300 acres. This 900 acre-foot condition was not intended to be a volumetric water consumption allowance.

Although Ready Mixed Concrete points to the volumetric provision as an authorization for consumption of 900 acre-feet of water by the irrigation right rather than a limitation on the allowable amount for field irrigation—the decree and referee's report do not contain language demonstrating that the court intended to recognize a fully consumable allocation of 900 acre-feet assignable to the water right.

In arguing that the decree is for 900 acre-feet of "developed water," Ready Mixed Concrete points especially to the final sentence of the decree: "So limited said decree is independent of other priorities in said Water District." We disagree, and we conclude that, although the referee demonstrably treated the water collected and used by the McCanne Ditch as tributary water, not "developed water," he wished, nevertheless, to reward the ditch developer for "saving" water that was being "wasted" by natural evaporation, and, so, entered a decree for a priority "independent" of existing priorities on the river. But, our cases hold that water "salvaged" by reducing evaporation or cutting vegetation cannot result in a decree free of the river's call for a new or changed appropriation. *Southeastern Colo. Water Conservancy Dist. v. Shelton Farms, Inc.*, 187 Colo. 181, 187, 529 P.2d 1321, 1325 (1975). To permit such a practice would encourage stripping the environment to its detriment and would reward developers with water that is properly allocated through the doctrine of prior appropriation.

Accordingly, our decisions in *R.J.A., Inc. v. Water Users Ass'n. of District No. 6*, 690 P.2d 823, 824 (Colo.1984), and *Giffen v. State*, 690 P.2d 1244, 1247–48 (Colo.1984), prevent water rights priorities from being created or enlarged free of the call of other water rights, by draining wetlands, marshes, and seeps, or by paving lands. In the name of reducing evaporation or transpiration, such "developed water" schemes seek to establish super priorities in the river system. Contrary to such proposals, we have held that water of the river system evaporated from soil or surface water, or transpired by plants, cannot be classified as nontributary or "developed water" that is fully consumable by a new, enlarged, or changed water right. *R.J.A.*, 690 P.2d at 826.

Our decision in *Shelton Farms* draws a basic distinction between "developed" and "salvaged" water. Both are terms of art to the water law. "Developed water"

is not naturally part of the river system but is introduced to the system by a developer and is fully consumable. "Salvaged water" describes development schemes that attempt to create an independent priority free of the river call for water that is naturally part of the stream system, by reducing evaporation or transpiration:[4]

> Both terms are words of art. Developed implies New waters not previously part of the river system. These waters are free from the river call, and are not junior to prior decrees. Salvaged water implies waters in the river or its tributaries (including the aquifer) which ordinarily would go to waste, but somehow are made available for beneficial use. Salvaged waters are subject to call by prior appropriators. We cannot airily waive aside the traditional language of the river, and draw no distinctions between developed and salvaged water. To do so would be to wreck havoc with our water law. Those terms, and others, evolved specifically to tread softly in this state where water is so precious.

*Shelton Farms*, 187 Colo. at 181, 529 P.2d at 1325. We also emphasized that the water law does not require every drop of water to be squeezed out of the watershed for human use. There must be a balance in the use of this most fundamental natural resource in relation to other natural resources, such as plants and trees. *Id.* at 191, 529 P.2d at 1327.

When water use was decreed for use by the McCanne Ditch right, its source of supply was naturally part of the South Platte River system. The 1918 decree and referee's report cannot be read as a whole and given effect unless we implement its conditions for return to the stream of water not consumed by the decreed irrigation use for growing crops on the 300 acres.

## C.  Change of Water Right

▮▮▮▮▮ Colorado's 1969 Adjudication and Administration Act codified principles and procedures for changes of water rights that evolved through statutes and case law decisions since the late 1890s.[5] In the case before us, the Ready Mixed Concrete application requested a change of use from irrigation to augmentation and replacement purposes, in addition to the decreed use. A change of water right is defined statutorily to include "a change in the *type*, place, or time of use." § 37–92–103(5), C.R.S. (2004)(emphasis added). To protect their water rights from injury, owners may freely object in order to hold applicants to the legal requirements for making a change to the prior decree and for inclusion of decree conditions alleviating injury to those water rights; in addition, the state water officials may object; and members of the public may oppose in order to enforce statutory requirements. *Shirola*, 937 P.2d at 747.

▮▮▮ Because actual beneficial use under a decreed water right defines the genesis, maturation, and limitation of every appropriative water right in this state, we have held that every water decree includes an implied limitation that diversions cannot exceed that which can be used beneficially; and the right

---

4. A third term of art, "reasonably efficient practices" of diversion, conveyance, and use contrasts with "developed" and "salvaged" waters. Colorado water law defines beneficial use to include reasonably efficient means of diversion, conveyance, and use. § 37–92–103(4), C.R.S. (2004). Thus, water users have a right and responsibility to engage in reasonably efficient water practices. Wasting water by diverting it when not needed for beneficial use, or running more water than is reasonably needed for application to beneficial use, is "waste." *Santa Fe Trail Ranches Prop. Owners Assn. v. Simpson*, 990 P.2d 46, 56 (Colo.1999). When waters natural to the watershed are released from the appropriator's control by seepage from the ditch or field irrigation, for example, as we recognized in *Comstock*, 55 Colo. at 255–56, 133 P. at 1111 (1913), they belong to the stream system and cannot be captured or reused except through a lawfully made decreed appropriation. *See Water Supply and Storage Co. v. Curtis*, 733 P.2d 680, 683 (Colo.1987) (concluding that "[o]nce the beneficial use upon which a water right is based has taken place, any unconsumed waters remain [w]aters of the state")(internal quotations omitted).

5. *See generally,* Justice Gregory J. Hobbs, Jr., *Colorado's 1969 Adjudication and Administration Act: Settling In,* 3 U. Denv. Water L.Rev. 1 (1999).

to change a water right is limited to that amount of water consumed beneficially over a representative historical period of time by use pursuant to the decree at the appropriator's place of use. *Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson,* 990 P.2d 46, 54 (Colo.1999). Because Ready Mixed Concrete proposed a change of water right, it bore the burden of quantifying the beneficial consumptive use made of the McCanne Ditch water for irrigation of the 300 acres of land. *Id.* at 56.

■ Decrees for irrigation rights that erroneously determined tributary water sources to be "nontributary" or "independent of other priorities," despite their tributary characteristics, are protected by res judicata as long as the water right is operated in conformity with the decree. *See Closed Basin Landowners Ass'n v. Rio Grande Water Conservation Dist.,* 734 P.2d 627, 637 (Colo. 1987)("A trial court has jurisdiction to render an erroneous decision, which may be reviewed on appeal. Consequently, a judgment entered within the jurisdiction of the court, even though wrong, is not subject to collateral attack."); *State Eng'r v. Smith Cattle, Inc.,* 780 P.2d 546, 549 (Colo.1989)(holding that the doctrine of res judicata barred relitigation of an allegedly erroneous court determination that certain waters were not tributary to the Arkansas River). However, a change of water right application reopens the prior decree for determination of the true measure of the appropriative water right's consumptive use draw on the river system. *Santa Fe Trail Ranches,* 990 P.2d at 57; *Pueblo W. Metro. Dist. v. Southeastern Colo.*

*Water Conservancy Dist.,* 717 P.2d 955, 959 (Colo.1986).

Res judicata constitutes an absolute bar *only* when there is in both the prior and subsequent suits identity of subject matter, identity of the cause of action, identity of parties to the action, and identity of capacity in the persons which or against whom the claim is made.

*City of Westminster v. Church,* 167 Colo. 1, 9, 445 P.2d 52, 55 (1968)(emphasis added).

■ Here, Ready Mixed Concrete requests to change the irrigation right in order to augment surface evaporation from mined gravel pits.[6] In proposing this change from its prior decree, Ready Mixed Concrete alters the subject matter, the cause of action, and the parties affected by the proposed action, in contrast to exercise of the water right pursuant to the terms of the existing decree. A change application typically involves a different type, place, or time of use from that which occurred under the original decree; it invokes the participation of any affected water right holder who chooses to participate; and the end result is either dismissal of the application for failure to meet the requirements for changing the water right or issuance of a decree allowing the change and accompanied by decree conditions necessary to protect other rights from injurious effects of the change. James N. Corbridge, Jr., *Historical Water Use and the Protection of Vested Rights: A Challenge for Colorado Water Law,* 69 U. Colo. L.Rev. 503 (1998).[7]

We conclude that the res judicata principles of claim or issue preclusion would not

---

6. See *Zigan Sand & Gravel v. Cache La Poudre Water Users Ass'n,* 758 P.2d 175 (Colo.1988) and *Central Colo. Water Conservancy Dist. v. Simpson,* 877 P.2d 335 (Colo.1994) for a discussion of the regulation of surface evaporation from gravel pits and the requirement of augmentation plans for gravel pits that expose groundwater to surface evaporation. *See* § 37–90–137(11), C.R.S. (2004).

7. As Professor Corbridge points out, over-appropriation characterizes Colorado's major watersheds, and change proceedings are critical to protecting existing water rights while allowing new water uses:

The importance of measuring historical consumption has increased substantially as water right changes and transfers have become the dominant method of meeting new water needs.

Most of the accessible watercourses in Colorado have already been heavily appropriated. New appropriations with junior priority dates are not dependable because they are unlikely to be satisfied, particularly in years of below average streamflow. Dependable water supplies for new or expanded uses can normally be acquired only by purchasing existing senior rights, most of which are currently used for agricultural purposes. Therefore the typical means of acquiring water today is to purchase an existing water right and apply for a change, including a new point of diversion and a change in use from agricultural to municipal or other uses.

James N. Corbridge, Jr., *Historical Water Use and the Protection of Vested Rights: A Challenge for Colorado Water Law,* 69 U. Colo. L.Rev. 503, 510 (1998).

apply in a change case to allow Ready Mixed Concrete the benefit of a priority independent of other priorities to South Platte River water. *See Farmers High Line Canal and Reservoir Co. v. City of Golden,* 975 P.2d 189, 199 (Colo.1999)(stating that claim preclusion does not prevent the water court from determining historical consumptive use of the water right for change purposes when this determination did not occur in a previous proceeding).

## III.

Accordingly, we affirm the water court's judgment.