WELL AUGMENTATION SUBDISTRICT OF the CENTRAL COLORADO WATER CONSERVANCY DISTRICT and South Platte Well Users Association, Applicants–Appellants

v.

CITY OF AURORA; Bijou Irrigation Company; Bijou Irrigation District; City of Boulder; Centennial Water and Sanitation District; Pawnee Well Users Inc.; Cache La Poudre Water Users Association; Lower Latham Reservoir Company; New Cache La Poudre Irrigating Company; City of Black Hawk; City and County of Denver; Ducommun Business Trust; City of Sterling; East Cherry Creek Valley Water and Sanitation; Public Service Company of Colorado; City of Englewood; Fort Morgan Reservoir; Jackson Lake Reservoir; The Farmers Reservoir and Irrigation Company; United Water and Sanitation District; City of Greeley; Harmony Ditch Company; Irrigationists' Association; Lupton Ditch Co. & Lupton Meadows Ditch Co.; North Poudre Irrigation Company; Riverside Irrigation District; Riverside Reservoir & Land Company; South Adams County Water & Sanitation District; State & Division Engineers; The Henrylyn Irrigation District; City of Thornton; Westfarm LLC; City of Westminster; and Greeley Irrigation Company, Opposers–Appellees

and

James Hall, Division Engineer for Water Division No. 1.

No. 08SA224.

Supreme Court of Colorado, En Banc.

Nov. 23, 2009.

As Modified on Denial of Rehearing Dec. 14, 2009.*

See also 73 P.3d 22.

* Justice Eid does not participate.

Lind Lawrence & Ottenhoff, LLP, P. Andrew Jones, David P. Jones, Kim R. Lawrence, Bradley C. Grasmick, Windsor, Colorado, Attorneys for Applicants–Appellants South Platte Well Users Association and Well Augmentation Subdistrict of the Central Colorado Water Conservancy District.

John W. Suthers, Attorney General, Paul L. Benington, Assistant Attorney General, Denver, Colorado, Attorneys for Opposer–Appellee James Hall, Division Engineer for Water Division 1, and Dick Wolfe, State Engineer.

Buchanan & Sperling, PC, John P. Justus, Veronica A. Sperling, Arvada, Colorado, Attorneys for Opposer–Appellee Centennial Water and Sanitation District, City of Boulder, Harmony Ditch Company, and Pawnee Well Users Inc.

Daniel J. Arnold, Michael L. Walker, Patricia L. Wells, Casey S. Funk, Mary B. Rastall, Denver, Colorado, Attorneys for Opposer–Appellee City and County of Denver.

Harvey W. Curtis & Associates, David L. Kueter, Sheela Stack, Englewood, Colorado, Attorneys Opposer–Appellee for City of Black Hawk.

Trout, Raley, Montaño, Witwer and Freeman, PC, Douglas M. Sinor, James Witwer, Denver, Colorado, Attorneys for Opposer–Appellee City of Greeley.

White & Jankowski, LLP, David F. Jankowski, Sarah A. Klahn, Alan E. Curtis, Denver, Colorado, Attorneys for Opposer–Appellee City of Sterling.

Dennis A. Hanson, Assistant City Attorney, Thornton, Colorado, Attorney for Opposer–Appellee City of Thornton.

Ryley Carlock & Applewhite, James M. Noble, Carolyn F. Burr, Denver, Colorado, Attorneys for Opposer–Appellee Public Service Company of Colorado, d/b/a Xcel Energy, Inc. and East Cherry Creek Valley Water and Sanitation District.

Alperstein & Covell, P.C., Cynthia F. Covell, Andrea L. Benson, Denver, Colorado, Attorneys for Opposer–Appellee Fort Morgan Reservoir and Irrigation Company and Jackson Lake Reservoir and Irrigation Company.

Moses Wittemyer Harrison & Woodruff PC, Richard J. Mehren, Boulder, Colorado, Attorneys for Opposer–Appellee South Adams County Water & Sanitation District.

Steven L. Janssen, Boulder, Colorado, Attorney for Opposer–Appellee The Henrylyn Irrigation District.

No appearance by or on behalf of: Bijou Irrigation Company; Bijou Irrigation District; Cache La Poudre Water Users Association; City of Aurora; City of Englewood; City of Westminster; Ducommun Business Trust; Greely Irrigation Company; Irrigationists' Association; Lower Latham reservoir Company; Lupton Ditch Company & Lupton Meadows Ditch Company; New Cache La Poudre Irrigation Company; North Poudre Irrigation Company; Riverside Irrigation District; Riverside Reservoir & Land Company; The Farmers Reservoir and Irrigation Company; United Water and Sanitation District; and Westfarm LLC.

Justice MARTINEZ delivered the Opinion of the Court.

## I. Introduction

In this appeal from the District Court for Water Division Number One ("water court"),

the Well Augmentation Subdistrict of the Central Colorado Water Conservancy District ("WAS") challenges certain terms and conditions imposed by the water court in its approval of WAS's proposed plan for augmentation. This case arises from seven applications filed in 2003 by twenty-two individual well owners and the South Platte Well Users Association. After it was formed in 2004, WAS became the primary applicant in the case. WAS represents 215 wells that withdraw water from the alluvium of the South Platte River in locations from Brighton to Fort Morgan.

The water court approved the plan for augmentation in May 2008, and imposed certain terms and conditions on the operation of the plan which WAS challenges on appeal. First, WAS argues the water court erred in requiring WAS to provide replacement water for depletions made prior to the filing of the augmentation plan application in 2003 that have a continuing injurious effect on surface water conditions. Second, WAS argues it was error for the water court to base replacement obligations for wells in the Box Elder Creek basin on conditions that would exist in the basin were it not for the historic pumping of wells in the area. Third, WAS urges this court to rule on whether the State and Division Engineers have the authority to administer a "well call" technique in their administration of the South Platte River basin. Finally, WAS argues the water court erred when it held that the proper standard of review to apply to decisions of the State Engineer approving substitute water supply plans is de novo.

We affirm the water court's requirement that WAS provide replacement water for pre–2003 depletions that have a continuing injurious effect on surface waters. We similarly affirm the water court's decision that replacement obligations in the Box Elder Creek basin must be determined based on surface water conditions that would exist absent pumping in the basin. Because the water court declined to grant WAS's request to include a "well call" provision in the decree, and WAS does not request that this

court order the State Engineer to implement a "well call" system, an opinion on the "well call" issue would be advisory and we decline to address it. Finally, although the issue of the proper standard of review to apply to approval of substitute water supply plans is moot, we nonetheless address the merits of the issue under the exception to the mootness doctrine applicable to issues that are capable of repetition, yet evade review. We reverse the water court's conclusion that such appeals should be reviewed de novo, and hold that section 37–92–308(4) substitute water supply plan ("SWSP") appeals should properly be reviewed under the standard of review set forth in the Colorado Administrative Procedure Act. § 24–4–106, C.R.S. (2009).

## II. Facts and Procedural History

This case arises from seven applications filed in 2003 by twenty-two individual well owners and the South Platte Well Users Association. The seven cases were consolidated and, after the Central Colorado Water Conservancy District formed WAS in 2004, WAS became the primary applicant in the case. The South Platte Well Users Association remained an applicant for the limited purpose of resolving issues related to substitute water supply plans issued in its favor; no individuals remain as applicants. Thirty-seven parties filed statements of opposition to the applications.

The WAS augmentation plan submitted to the water court sought to provide augmentation water to offset the out-of-priority depletions of 215 structures that divert groundwater from the South Platte River basin.[1] Prior to filing the present consolidated application, many of the wells included in the WAS plan operated under annual substitute water supply plan approvals issued by the State Engineer in favor of Groundwater Appropriators of the South Platte ("GASP"). *Groundwater Appropriators of the S. Platte River Basin v. City of Boulder*, 73 P.3d 22, 26–77 (Colo.2003). In several cases, this court held that, without clear statutory authority from the General Assembly, the

1. Initially, WAS and the South Platte Well Users Association sought to augment 449 wells; however, in 2007, WAS removed 234 wells from the augmentation plan.

State Engineer lacked the authority to promulgate rules allowing out-of-priority diversions by alluvial wells. These rulings had the effect of requiring an adjudicated augmentation plan for every large capacity alluvial well in the state. *See Simpson v. Bijou Irrigation Co.*, 69 P.3d 50, 63–67 (Colo. 2003); *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1153 (Colo.2002). After these rulings, GASP dissolved and GASP well owners petitioned the Central Colorado Water Conservancy District to establish WAS in order to seek a court-approved augmentation plan for the displaced GASP well owners and other alluvial well owners in Division One. The wells currently involved in WAS represent a subset of the former GASP wells.

A thirty-day trial on the consolidated cases was initially scheduled for 2006; however, it was not held until early 2007. From 2003–2005, WAS and its predecessors operated substitute water supply plans approved by the State Engineer pursuant to section 37–92–308(4), C.R.S. (2009). Several Opposers appealed the 2003 and 2004 SWSPs, and the water court consolidated the SWSP appeals with the augmentation plan application. The parties contested the proper standard of review for the water court to apply when reviewing the State Engineer's approval of the SWSPs. WAS and the State Engineer argued the standard was arbitrary and capricious under the state Administrative Procedure Act. The Opposers argued the proper standard was de novo. Prior to the originally-scheduled 2006 trial, the water court issued an order holding that the proper standard was de novo.

When the trial was re-scheduled for 2007, certain Opposers argued they would be harmed by the continuance because the SWSPs which were to be reviewed at the same time as the plan for augmentation were insufficient to prevent injury to their vested rights. To remedy this situation, the water court offered WAS the option of either proceeding to trial on the SWSP appeals as originally scheduled or continuing trial until 2007 and voluntarily curtailing all well pumping until after the water court entered a decree on the augmentation plan. WAS

chose the second option, and the SWSP appeals consequently were never heard.

In June of 2006, certain Opposers filed a motion for determination of a question of law related to the proper method for calculating depletions for WAS wells installed in the alluvium of Box Elder Creek. The motion asked the court to rule on whether determination of the amount of depletions to the South Platte River from the pumping of wells in the Box Elder Creek basin must be made based upon present hydrological conditions in the basin or upon the hydrological conditions that would exist in the basin absent well pumping. The Opposers argued that, although Box Elder Creek is ephemeral in its present state, absent pumping in the basin, Box Elder Creek would be hydrologically connected to the South Platte, and that replacement obligations should therefore be determined based on hydrological conditions that would exist absent pumping. WAS disagreed and argued that current conditions were the only relevant consideration.

In ruling on the motion, the water court agreed with the Opposers and held that WAS should "base the quantity of [its] depletions on the conditions in the basin prior to well pumping." The water court held that, at trial, WAS could present evidence to show that the groundwater in the Box Elder Creek basin is nontributary; however, it could not present evidence showing that the groundwater in the Box Elder Creek basin is nontributary due to artificial conditions, such as groundwater pumping. The court reserved for trial the factual determination of the time, location, and amount of WAS's actual depletions and consequent replacement obligations.

Trial was held over thirty days between February 2007 and May 2007. At trial, the parties presented detailed evidence related to affected senior rights; the hydrology and hydrogeology of the South Platte River basin, the Box Elder Creek basin, and Beebe Draw; numerous surface and groundwater models; historical use analysis; return flows; water rights administration; river and augmentation plan administration; and the testimony of numerous expert and lay witnesses. Regarding the Box Elder issue, WAS pre-

sented evidence based on a computer model showing that the depletive effect of the pumping of WAS wells in the Box Elder basin would be 15.4% of total on-site consumptive use and that such depletions would increase by 1% every three years. WAS and the Opposers also presented evidence of the past conditions in Box Elder Creek and evidence regarding conditions in the basin that would exist both with and without well pumping.

WAS's augmentation plan called for a novel approach, termed "well call" by WAS, to administer the groundwater seniority system. WAS argued that under the approach currently employed in Division One, well users are being required to replace more water than is needed in order to ensure reservoirs along the South Platte are able to achieve a complete fill every year. Generally, the "well call" approach is based on a bypass call, which is a Division One administrative tool used in administration of surface rights in situations in which a senior right is not satisfied, but a call by that right would produce more water than necessary to satisfy the calling right. If such a call would produce excess water at the senior calling right's headgate, the Division Engineer imposes a call by an upstream junior right to provide water to the downstream senior right. An amount of water sufficient to satisfy the senior right is bypassed at the headgate of the upstream calling junior and delivered to the senior right. The junior calling right is then permitted to divert any available water that is not needed by the senior.

WAS's proposed "well call" system would operate in a somewhat similar manner to a bypass call, and the Division Engineer would select a WAS well priority date as the bypass calling right in order to fill the South Platte reservoirs before the owners of senior direct flow rights make calls in the spring. Under this system, all wells junior to the date of the calling well would have to replace water and all wells senior to the calling well would not be required to replace water. Under this provision, a call by a well would be, in effect, a request for additional water from junior priorities to satisfy or negate the depletion

caused by the well, although all of the water would go to the reservoirs.

At trial, several Opposers presented substantial evidence concerning the injury to vested rights that would occur if the "well call" provision was included in the decree. James Hall, the Division One Engineer, testified that, although WAS's proposed "well call" would be administered in response to river conditions, he was uncertain as to how much water a specific call might produce through the curtailment of upstream junior rights. This uncertainty was compounded by the fact that the effects of groundwater depletions, or curtailment of groundwater depletions, are not immediately felt by surface waters, and in some cases lag by many years. Mr. Hall also testified that use of the "well call" provision might not result in water actually reaching senior calling reservoirs.

The water court entered an extensive post-trial order in October 2007 ("post-trial order"), with the final decree following in May 2008.

In the post-trial order, relying on several models used to estimate groundwater depletions, the water court found that the years of pumping under the GASP substitute water supply plans and other unauthorized groundwater pumping had created large depletions that would affect the South Platte River for years after the pumping ceased. In several pre-trial orders and the post-trial order, the water court made a number of rulings related to groundwater depletions completed prior to the filing of the augmentation plan application. The net effect of these rulings requires WAS to replace all depletions from wells included in the WAS augmentation plan that engaged in out-of-priority, pre-decree pumping, including pumping that occurred prior to 2003—the date the application was filed. However, the replacement obligation is limited to pre–2003 depletions that have a continuing future effect on surface water conditions. To reach this conclusion, the water court relied on section 37–92–305, C.R.S. (2009), which allows the court to add terms and conditions to the plan for augmentation aimed at preventing injury, as well as the language of section 37–92–305 stating "terms and conditions [of the augmentation plan]

shall require replacement of out of priority depletions that occur after any ground water diversions cease." The water court determined that the legislature's use of the word "any" indicates an intent to apply the depletion replacement requirement to depletions resulting from all out-of-priority pumping, without any temporal limitation.

In the post-trial order, the water court found that, while an 1860 Government Land Office survey indicated that Box Elder Creek was ephemeral in the later part of the 1800s, beginning in 1907, increased return flows from water imported into the basin caused Box Elder Creek to begin flowing to the South Platte on a regular basis. Evidence presented to the water court suggested that return flows from 1931–1999 averaged 14,781 acre-feet annually. These return flows were comprised of three categories of water: (1) leakage from reservoirs constructed in the Box Elder basin; (2) canal seepage from the Denver Hudson and other delivery canals; and (3) return flows from application of Farmers Reservoir and Irrigation Company and Henrylyn Irrigation District water to surface irrigation in the Box Elder basin. However, beginning in the 1940s, pumping of wells in the Box Elder basin, along with years of drought in the 1950s, caused the water table to be lowered to such an extent as to become disconnected from Box Elder Creek, causing Box Elder Creek to cease flowing to the South Platte on a regular basis.

Based on these findings, the water court reasoned that the pumping of wells in the basin had intercepted seepage and return flows, depriving the South Platte of thousands of acre feet of seepage and return flows. Therefore, the court rejected WAS's proposal for replacement of 15.4% of total onsite consumptive use, increasing by 1% every three years, finding that it would not replace depletions at the proper time. The water court instead ordered WAS to calculate the amount and time of all present and future depletions from wells in the basin by: (1) lagging 100% of the depletions to Box Elder Creek using the Glover–Balmer analytical method [2] and (2) assuming that the depletions to Box Elder Creek would be felt immediately at the South Platte River.

In the post-trial order, the water court noted that there was "significant confusion at trial concerning how the 'well call' provision would operate because it is significantly different than a surface diversion [bypass] call." The water court held the "well call" system suffered from both "factual issues" as well as "legal problems."

Regarding the factual issues, the court declined to include the "well call" provision in the final decree because there was inadequate information regarding the implementation and effects of the "well call" provision which could potentially injure other water rights. The court stated there was also uncertainty as to how the "well call" provision would be administered, and that evidence presented at trial demonstrated that WAS had not fully considered the injury to vested water rights and that the "well call" provision would have a "substantial but as-of-yet unknown impact." Accordingly, the water court concluded that it could not determine that the "well call" provision would not injure vested water rights, as required by section 37–92–305.

Regarding the legal problems, the court noted that, while there is nothing in the Water Right Determination and Adjudication Act of 1969 ("1969 Act") that prohibits a "well call," it is a significant departure from the 1969 Act and controlling case law. The court stated that the 1969 Act, which integrated wells into the priority system through plans for augmentation, does not permit wells to place a call for water that would curtail diversions by other water rights. Rather than placing a call, the 1969 Act requires that well pumping be curtailed if

---

**2.** The Glover–Balmer analytical method, also referred to as "the Glover model," is a generalized analytical model used to determine aquifer penetration and groundwater interaction with surface water. The Glover model assumes the river fully penetrates a homogenous, isotropic aquifer that has a flat water table surface. Under the Glover model, all pumped groundwater is assumed to come from the stream system, which is in full hydraulic connection with the adjacent aquifer. Gordon McCurry, Ph.D., *Comparing Methods of Estimating Stream Depletions Due to Pumping*, Southwest Hydrology, March/April 2004, at 6.

injurious depletions are not replaced. The water court reasoned that the "well call" provision would therefore create an alternative to plans for augmentation under the 1969 Act. Additionally, because the court held the "well call" provision "goes beyond" a typical augmentation plan in both its direct and indirect impacts on other water rights, and the applications in this case did not contain notice of the "well call" provision, the water court declined to adopt the provision in the decree because notice of it was inadequate. Accordingly, the proposed "well call" provision was not included in the decree.

### III. Analysis

#### A. Pre–2003 Depletions

WAS makes two arguments regarding the water court's determination that, to avoid further injury to senior rights, the augmentation plan must include replacement water for pre–2003 depletions that have a continuing effect on river conditions. First, WAS argues the water court lacked jurisdiction to order WAS to replace pre–2003 depletions. Second, WAS argues that, even if the water court had jurisdiction to make such a determination, the requirement is inconsistent with the General Assembly's intent as expressed in section 37–92–305. Each argument is addressed in turn below.

#### 1. Jurisdiction

■ Under section 37–92–302, C.R.S. (2009), publication of an application for approval of an augmentation plan is authorized in lieu of personal service. *See also Gardner v. State*, 200 Colo. 221, 227, 614 P.2d 357, 361 (1980). Water court proceedings are in rem, and once notice of the application is published through the statutory resumé publication procedure, the water court achieves in rem jurisdiction over the matter. *See Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 38 (Colo.1997); *Louden Irrigating Canal Co. v. Handy Ditch Co.*, 22 Colo. 102, 113, 43 P. 535, 539 (1895).

WAS argues that, although the water court clearly has jurisdiction over the augmentation plan, and, under section 37–92–305, has the obligation to order terms and conditions

for the plan that dictate when and how the well water rights may be diverted out-of-priority in the future, the water court does not have jurisdiction to order WAS to provide augmentation water for pumping that occurred prior to the filing of the augmentation plan application. WAS asserts that such a requirement is beyond the scope of the resumé publication procedure contained in section 37–92–302. WAS argues that, for the water court to impose such a requirement, the court must have personal jurisdiction over the well owners and that publication of the water division resumé does not imbue the court with personal jurisdiction over the well owners.

■ WAS contends this court decided "a nearly identical issue" in *Groundwater Appropriators of the South Platte River Basin*, 73 P.3d at 23, where we upheld the water court's denial of an opposer's request for an injunction as beyond the scope of the procedures permitted under section 37–92–302. WAS argues the water court's requirement that WAS provide augmentation water for pre–2003 depletions, a requirement initially proposed by certain Opposers, has the same practical effect as the opposers's request for an injunction in *Groundwater Appropriators of the South Platte River Basin*. WAS's reasoning is unpersuasive and misapprehends the nature of water court proceedings.

In *Groundwater Appropriators of the South Platte River Basin*, the applicant, GASP, sought approval of a conditional water right under the statutory resumé publication procedure outlined in section 37–92–302. *Id.* at 23–24. Parties opposing the application sought an order enjoining out-of-priority pumping by GASP member wells pursuant to a substitute water supply plan. This court upheld the water court's denial of the injunction, holding that the substitute water supply plan was unrelated to the subject of the application and the requested injunction was therefore beyond the scope of the "special statutory proceedings" contained in section 37–92–302.

■■ Section 37–92–302 provides for substituted service through the publication of a water division resumé for matters involving applications for water rights, changes of wa-

ter rights, and plans for augmentation. Publication of the notice provides the water court with subject matter jurisdiction over all matters necessary to resolution of the application for water rights, change of water rights, or plan for augmentation. *See Dallas Creek Water Co.*, 933 P.2d at 38 ("When the proceeding involves a matter assigned by statute to the water court, jurisdiction is thereby conferred over persons and property affected by the application...."). "Subject matter jurisdiction concerns the court's authority to deal with the class of cases in which it renders judgment. The nature of the claim and the relief sought are to be examined in determining whether the court has subject matter jurisdiction." *Id.* (internal quotations omitted).

In contrast to *Groundwater Appropriators of the South Platte River Basin*, the Opposers in this case were not seeking an injunction; instead, the Opposers sought to ensure that the terms and conditions included in the plan for augmentation adequately protected vested water rights from injury—something the water court must ensure before it may approve a plan for augmentation. *See* § 37–92–305(3), (8). Here, the water court found that the augmentation plan would not prevent continuing injury from the pre–2003 depletions without providing for replacement water to offset the continuing injurious effect of those depletions. Therefore, the relief requested by the Opposers—replacement of pre–2003 pumping causing injury to vested rights—is directly related to the subject of approval of the augmentation plan and within the scope of section 37–92–302 proceedings.

■ Water rights are decreed to structures and points of diversion in specified amounts for beneficial uses. *Dallas Creek Water Co.*, 933 P.2d at 38 (citing *Gardner*, 200 Colo. at 225–26, 614 P.2d at 360). Water court approval of a plan for augmentation allows a water right with a junior priority date to divert out-of-priority, provided that the junior right supplies additional augmentation water to offset the out-of-priority depletion. Because water rights are "kept in the name of the diversion or storage structure, rather than by owner name, and water right transfers are not recorded," *Gardner*,

200 Colo. at 227, 614 P.2d at 361, terms and conditions decreed by the water court attach to the water right and follow it regardless of who may own or operate the right, *id.; Dallas Creek Water Co.*, 933 P.2d at 39. In the context of plans for augmentation, the water rights included in the plan are augmented, and the court cannot approve a plan if senior vested rights will be harmed through out-of-priority diversions made by the water rights included in the plan, regardless of ownership of the rights.

Here, when WAS filed the plan for augmentation pursuant to section 37–92–302, it invoked the water court's jurisdiction over the water rights included in the plan. The water court then had a duty under section 37–92–305 to ensure that operation of the plan would not prove injurious to senior vested water rights and decreed conditional water rights. In order to fulfill this duty and prevent harm to senior water rights, the water court conditioned approval of the augmentation plan on the requirement that WAS provide replacement water for pre–2003 depletions that are currently affecting surface water conditions. Requiring WAS to provide replacement water for such depletions is specifically aimed at preventing injury to senior water rights, and is accordingly within the scope of the proceedings outlined in section 37–92–302. Therefore, an analysis of "the nature of the claim and the relief sought," see *Dallas Creek Water Co.*, 933 P.2d at 38, reveals that requiring WAS to provide augmentation water for pre–2003 diversions presently affecting surface water conditions is directly related to the plan for augmentation, and the water court therefore had jurisdiction to impose such a requirement.

### 2. Section 37–92–305

■ The 1969 Act integrated wells into the priority system through the operation of plans for augmentation. Plans for augmentation allow a water user to divert water out-of-priority "only if injury to holders of senior water rights is avoided." *Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106, 1112–13 (Colo.1990)(citing *Cache La Poudre Water Users Ass'n v. Glacier View Meadows*, 191 Colo. 53, 61, 550 P.2d 288, 294 (1974)). The

express purpose of the 1969 Act is to "integrate the appropriation, use, and administration of underground water tributary to a stream with the use of surface water in such a way as to maximize the beneficial use of all of the waters of this state." § 37–92–102(1)(a), C.R.S. (2009); *see also Bijou Irrigation Co.*, 69 P.3d at 60 (under the 1969 Act "wells were required to be integrated into the priority system").

The statutes governing plans for augmentation "reflect the intent of the General Assembly ... to promote maximum development and use of Colorado's water resources while at the same time ensuring the protection of established water rights." *Danielson*, 791 P.2d at 1113. Section 37–92–305(3), (5), and (8) provides the statutory standards for approval of augmentation plans, and the focus for approval is on whether the plan adequately protects the rights of senior appropriators.

Subsection (3)(a) states that a plan for augmentation "shall be approved if such ... plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right." Subsection (5) states, "In the case of plans for augmentation ..., the supplier may take an equivalent amount of water at his point of diversion or storage if such water is available without impairing the rights of others." Subsection (8)(a) requires the water court, "in reviewing a proposed plan for augmentation and in considering terms and conditions that may be necessary to avoid injury," to consider "the depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water that would be provided by the applicant, and the existence, if any, of injury" to any person entitled to use water under a vested water right or a decreed conditional water right. Subsection (8)(c) states "a plan for augmentation shall be sufficient [if] ... the applicant ... provide[s] replacement water" to the extent "the senior would be deprived of his or her lawful entitlement" of water. Subsection (8)(c) also requires the terms and conditions of the augmentation plan to require replacement of "out-of-priority depletions that occur after any ground water diversions cease."

WAS admits that no provision of the 1969 Act forbids the conditioning of augmentation plan approval upon the replacement of well depletions caused by pumping that occurred prior to the filing of the augmentation plan application. However, relying on the language of section 37–92–305(3), (5), and (8), WAS asserts that requiring replacement water for pre–2003 depletions is contrary to the intent of the General Assembly. WAS argues that, because the water court's task is to consider whether the "plan" will injuriously affect senior water rights, the only way the plan could injuriously affect senior rights is if diversions authorized by the plan result in un-replaced depletions at some point in the future. WAS argues the injury resulting from depletions caused by pumping completed prior to approval of the plan cannot logically be caused by the approval of the plan itself, and exists whether or not the plan is approved.

Similarly, WAS argues that the phrase "applicant's use or proposed use of water" contained in section 37–92–305(8)(a) limits the water court's consideration to depletions caused by pumping occurring under an approved substitute water supply plan during the time the application is pending. WAS also argues section 37–92–305(8)(c)'s instruction that the water court consider the extent to which senior rights "would be deprived" shows the General Assembly intended to limit replacement obligations to depletions made after the filing of the augmentation plan application. However, we find WAS's reasoning unpersuasive.

In interpreting a statute, our "fundamental responsibility" is to "give effect to the General Assembly's purpose and intent in enacting the statute." *Empire Lodge Homeowners' Ass'n*, 39 P.3d at 1152. In so doing, we must give effect to each word and construe each provision in harmony with the overall statutory design, whenever possible, and consider the General Assembly's course of action and intent when enacting, amending, and repealing statutes. *Id.*

Under section 37–92–305, the water court has the power to require terms and conditions in the augmentation plan aimed at preventing injury to vested water rights and conditional decreed water rights. Section 37–92–305(8)(a) states:

[I]n reviewing a proposed plan for augmentation and in considering terms and conditions that may be necessary to avoid injury, the referee or the water judge shall consider the depletions from an applicant's *use or proposed use* of water, in quantity and in time, the amount and time of the augmentation water that would be provided by the applicant, and the existence, if any, of injury to any owner of or persons entitled to use water under a vested water right or a decreed conditional water right.

(Emphasis added).

WAS's argument that the phrase "applicant's use or proposed use of water" limits the water court's consideration to depletions caused by pumping under an approved substitute water supply plan is unnecessarily narrow. WAS's interpretation rests on the assertion that, in this case, WAS is the "applicant," and, accordingly, the "use" at issue could only occur after the filing of the augmentation plan application. Therefore, according to WAS, the only "use" the "applicant" could make of the water would be uses made under substitute water supply plans, approved after the filing of the application. WAS's interpretation, however, is not supported by the statutory language or the overall scheme of the 1969 Act.

As discussed above, in the context of augmentation plans, it is the water rights included within the plan that are augmented, and those rights must provide replacement water for any injurious depletions they have made, without regard to the individual ownership of the water right. Therefore, use of the term "applicant" does not mean that the party currently applying for approval of the augmentation plan is only responsible for injurious depletions it made itself. Rather, the "applicant" is responsible for accounting for all injurious depletions made by water rights covered by the plan. This is particularly clear in cases such as this, where the entity applying for the plan represents a number of different water rights, as it is those water rights, not the entity itself, that "use" the water by making out-of-priority depletions. If the General Assembly intended to limit the "applicant's use" of water to substitute water supply plans, it could easily have done so by utilizing language specific to substitute water supply plans in section 37–92–305(8)(a), rather than using the broad term "applicant's use or proposed use."

A better understanding of the phrase "use or proposed use" is that the General Assembly chose to employ a broad phrase to enable the water court to craft terms and conditions aimed at protecting water rights from injury without temporal limitation as to when the injurious pumping occurred. The choice of these words indicates the General Assembly intended the water court to consider uses that have occurred and are occurring (the "use" of the water), as well as uses that will occur under the proposed augmentation plan (the "proposed use" of the water). This understanding serves section 37–92–305's express requirement that augmentation plans shall be approved only upon terms and conditions that prevent injury to senior water rights.

Similarly, section 37–92–305(8)(c) states, in pertinent part, "terms and conditions [of the augmentation plan] shall require replacement of out-of-priority depletions that occur after *any* ground water diversions cease." (Emphasis added). Use of the expansive term "any" indicates the General Assembly's intent that terms and conditions in the augmentation plan must ensure replacement of out-of-priority depletions after all depletions cease. *Black's Law Dictionary* defines "any" as "every" or "all." *Black's Law Dictionary* 94 (6th ed.1990). If the General Assembly intended to confine replacement obligations to a limited subset of depletions—that is, depletions made after the filing of an augmentation plan application—it could have done so by employing language aimed at narrowing the category of depletions for which the applicant must provide replacement water. Instead, the General Assembly selected a word with an expansive meaning which would allow the water court to require a replacement obligation for all injurious de-

pletions without temporal limitation. This interpretation is consistent with section 37–92–305's overall mandate that plans for augmentation may only be approved subject to terms and conditions that will prevent injury to senior water rights.

WAS's argument that section 37–92–305(3)'s use of the word "plan" evidences an intent that augmentation plans only replace depletions occurring after the filing of the application runs contrary to the 1969 Act's express purpose to integrate tributary wells into the prior appropriation system. The "plan" itself does not injure vested water rights. Rather, it is the out-of-priority depletions caused by the pumping of wells included in the plan that causes injury. WAS's interpretation would reward well owners who postpone applying for a permanent augmentation plan as long as possible to avoid responsibility for depletions that have yet to affect surface water conditions.

Here, certain wells contained in the WAS augmentation plan engaged in out-of-priority pumping prior to the filing of the augmentation plan application in 2003. The pumping of alluvial, or tributary, wells reduces surface flows to the rivers to which the wells are hydrologically connected. *See Bijou Irrigation Co.*, 69 P.3d at 70. However, the time and amount of the reduction depends on several factors, including the distance between the well and the stream, the transmissibility of the aquifer, the depth of the well, the time and volume of pumping, and return flow characteristics. *Id.* Because groundwater depletions can lag behind surface water conditions by many years, the effects of a groundwater depletion may not be felt by surface waters for long periods of time. In this case, the water court found that certain pre–2003 depletions have a continuing future impact on surface water conditions. Therefore, as a term and condition to approval of the augmentation plan, the water court ordered WAS to provide replacement water for pre–2003 depletions that will continue to affect the river in the *future*.

Accordingly, WAS's argument that section 37–92–305(8)(c)'s instruction that the water court consider the extent to which senior rights "would be deprived of" water shows the General Assembly's intent to limit replacement obligations to depletions made after the filing of the augmentation plan application is unpersuasive. Section 37–92–305(8)(c)'s reference to the future impacts of pumping is consistent with the water court's order that WAS provide replacement water for pre–2003 depletions that have a continuing future impact on surface water conditions. The requirement imposed by the water court prevents present and future injury to senior water rights by requiring replacement water for wells that engaged in pre–2003 out-of-priority pumping, the effects of which have not yet been felt by the river.

Contrary to WAS's characterization of the requirement that WAS replace pre–2003 depletions, this is not a matter of requiring WAS to provide replacement water for injuries that have already occurred. Rather, the groundwater pumping may have occurred before the filing of the application in this case, but the river is currently being impacted by the pre–2003 depletions. We addressed a related issue in *In re Steffens*, 756 P.2d 1002 (Colo.1988).

In *Steffens*, an applicant sought to change the point of diversion of an irrigation water right to another ditch. *Id.* at 1003. The sole opposing party complained that the change in point of diversion should not be permitted unless terms and conditions were imposed to ensure that the water right was not used on more or different land than had been originally decreed. *Id.* at 1004. The applicant claimed that he had been using the water right on other lands for many years, so the expanded use was a preexisting injury that could not be raised in a change of water right proceeding. *Id.* This court disagreed and stated "terms and conditions must be imposed under section 37–92–305(3) to avoid perpetuation of the injury to [the objector] from the change in point of diversion." *Id.* at 1007.

Here, although the groundwater pumping occurred prior to the filing of the application, the pumping has a continuing effect on surface conditions. As in *Steffens*, the fact that out-of-priority depletions may have occurred for many years prior to the filing of the application does not excuse the requirement

that the depletions causing future injury be replaced.

Because of the difficulties associated with determining when, and to what extent, a groundwater depletion will have an injurious effect on surface waters, the 1969 Act provides water courts with a degree of flexibility to craft terms and conditions in augmentation plans. However, this flexibility is bounded by the requirement that operation of an augmentation plan may not cause harm to senior vested water rights or decreed conditional water rights.

To read section 37–92–305 as forbidding a water court from requiring augmentation plan applicants to provide replacement water for depletions made prior to the filing of the application that have a continuing effect on surface water conditions would enable certain well owners to avoid replacing post-pumping depletions. For example, under WAS's proposed interpretation of section 37–92–305, a well owner would be able to dissolve its current plan for augmentation, thereby escaping an obligation to continue to replace depletions pursuant to the plan, and then form a new entity to act as the applicant for a new plan for augmentation, resuming pumping without having to replace the continuing injurious depletions caused by pumping under the previous plan. Given that groundwater depletions often lag surface water conditions for years, a well owner could conceivably continue to pump under a new plan for augmentation while avoiding replacement obligations for pumping from the same well under a previous plan for augmentation. Such a result is contrary to the requirements of section 37–92–305 and the overall objective of the 1969 Act.

In sum, the water court's decision to condition operation of WAS's augmentation plan on replacement of pre–2003 depletions that have a continuing effect on surface water conditions is supported by the language of section 37–92–305 as well as the 1969 Act's purpose of integrating groundwater into the surface water priority system without causing harm to senior vested rights.

## B. Box Elder Depletions

An augmentation plan requires the replacement of out-of-priority depletions "so that holders of decreed water rights can enjoy the quantity of supply that would be available to them absent those depletions." *In re Application for Plan for Augmentation of the City and County of Denver ex rel. Bd. of Water Comm'rs*, 44 P.3d 1019, 1025 (Colo. 2002). The augmentation plan applicant bears the initial burden of producing sufficient evidence to establish a prima facie case that the proposed depletions will be non-injurious. "A classic form of injury involves diminution of the available water supply that a water rights holder would otherwise enjoy at the time and place and in the amount of demand for beneficial use under the holder's decreed water right operating in priority." *Farmer's Reservoir and Irrigation Co. v. Consolidated Mut. Water Co.*, 33 P.3d 799, 807 (Colo.2001).

Seepage water and return flows belong to the river system and are subject to appropriation and administration in order of priority. *Ready Mixed Concrete Co. in Adams County v. Farmers Reservoir & Irrigation Co.*, 115 P.3d 638, 642 (Colo.2005); *Comstock v. Ramsay*, 55 Colo. 244, 256–57, 133 P. 1107, 1111 (1913). As early as 1913, in the venerable *Comstock* decision, this court recognized that "practically every decree on the South Platte River, except possibly only the very early ones, is dependent for its supply, and for years and years has been, upon return, waste and seepage waters." *Id.* at 254, 133 P. at 1110.

Under our priority system, appropriators are permitted to divert the waters of Colorado and apply them to beneficial uses. However, waters remaining after application to a decreed use "belong once again to the river system at the moment they are released by the user ... and start to flow back to the river." *Id.* at 256, 133 P. at 1111; *see also Ready Mixed Concrete Co.*, 115 P.3d at 643 (discussing the holding of *Comstock*). Seepage water and return flows "cannot be lawfully diverted from their course by independent appropriation, to the injury of those having decreed priorities therefrom." *Comstock*, 55 Colo. at 256, 133 P. at 1111. Ac-

cordingly, if it can be shown that "the water would ultimately return to the river, it is said to be part and parcel thereof, and senior consumers are entitled to use it according to their decreed priorities." *Se. Colo. Water Conservancy Dist. v. Shelton Farms, Inc.*, 187 Colo. 181, 187, 529 P.2d 1321, 1325 (1974).

■■■■■ Colorado water law contains a presumption that all waters are tributary to a natural stream and subject to the constitutional right of prior appropriation. *Ready Mixed Concrete Co.*, 115 P.3d at 642; *De-Haas v. Benesch*, 116 Colo. 344, 351, 181 P.2d 453, 456 (1947). A party seeking to rebut the presumption and establish that waters are nontributary bears the burden of proving that fact. *Ready Mixed Concrete Co.*, 115 P.3d at 642. If a party can establish that groundwater outside of a designated groundwater basin is nontributary, such water is free from the call of the river and is not subject to the prior appropriation system.[3] *Whitten v. Coit*, 153 Colo. 157, 174, 385 P.2d 131, 140 (1963); Trout, Witwer & Freeman, P.C., *Acquiring, Using, and Protecting Water in Colorado* 64 (2004). Accordingly, if an augmentation plan applicant establishes that certain wells included in the plan draw from nontributary groundwater, he is relieved of the obligation to augment those wells. However, if wells included in the plan draw from tributary groundwater, the applicant must replace such waters, in quantity and in time, so that senior water users are not harmed.

Here, in a pre-trial order, the water court held that WAS must base the quantity of its depletions in the Box Elder Creek basin on conditions that would exist in the basin were it not for the pumping of wells in the basin. The water court held that, at trial, WAS could present evidence to show that the groundwater in the Box Elder Creek basin is nontributary; however, it could not present evidence showing that water in the basin is nontributary due to artificial conditions, such as groundwater pumping.

■■■■■ In its post-trial order, the water court found that WAS did not present sufficient evidence to rebut the presumption that the waters in the Box Elder Creek basin are tributary. Rather, the water court found that increased irrigation and importation of water into the Box Elder Creek basin caused Box Elder Creek to begin flowing to the South Platte River on a regular basis beginning in the 1930s. However, the pumping of wells in the Box Elder Creek basin intercepted the return flows and seepage water that had established the hydrological connection between Box Elder Creek and the South Platte. This interception caused Box Elder Creek to cease flowing to the South Platte on a regular basis, depriving senior users on the South Platte of the return flows to which they were entitled. The water court found that, under WAS's proposed replacement scheme, WAS wells would be pumping seepage water and return flows that rightfully belong to the river. Accordingly, the water court ruled that allowing WAS to base its replacement obligation on present conditions, as proposed by WAS, would run afoul of longstanding principles of Colorado water law. We agree with the water court.

WAS does not argue that the waters in the Box Elder Creek basin should be treated as nontributary groundwater. Rather, WAS urges this court to adopt the replacement schedule contained in their augmentation plan application under which WAS would replace 15.4% of total on-site consumptive use,

---

3. Presently, the Box Elder Creek basin is not a designated groundwater basin under section 37–90–103(6), C.R.S. (2009). In 2006, the Central Colorado Water Conservancy District, WAS's parent district, filed a petition asking the Colorado Ground Water Commission to designate large portions of the Box Elder Creek basin as a designated groundwater basin under section 37–90–106(1)(a), C.R.S. (2009). After a nine-day administrative hearing, the hearing officer entered an order denying the petition. The hearing officer's decision was appealed to the Ground Water Commission, who, in turn, affirmed the denial.

Central Colorado Water Conservancy District appealed the Ground Water Commission's decision to the Weld County District Court. Case No. 07CV487. A final decision in that case is pending. However, whether portions of the Box Elder Creek basin are eventually classified as a designated groundwater basin pursuant to section 37–90–103 has no effect on the outcome of the present case because, at the time WAS filed the augmentation plan application, no portions of the Box Elder Creek basin were classified as designated groundwater.

increasing by 1% every three years.[4] WAS argues that this figure would replace water in an amount commensurate with the actual impact of WAS well pumping in the basin under current hydrological conditions. WAS asserts that the water court's requirement that replacement obligations be based on an assumption that a live stream exists in Box Elder Creek places the onus of prior out-of-priority pumping in the basin on WAS. WAS states that the pumping of wells in the basin that caused Box Elder Creek to cease flowing to the South Platte on a regular basis occurred prior to the filing of WAS's augmentation plan, and WAS therefore should not be responsible for replacing depletions resulting from such pumping.

However, WAS misconstrues the thrust of the water court's requirement that replacement obligations be based on hydrological conditions that would exist in the Box Elder Creek basin absent historic well pumping. The water court did not order WAS to provide replacement water to account for all historic depletions. Rather, the water court held that, going forward, wells included in the WAS augmentation plan could not intercept return flows and seepage water that rightfully belong to the South Platte River without providing adequate replacement water.

The water court found that, were it not for the out-of-priority pumping of wells in the alluvium of Box Elder Creek, annually approximately 14,000 acre feet of return flows and seepage water from the Box Elder Creek basin would eventually make their way to the South Platte River. However, the pumping of wells in the basin has intercepted these return flows, which, based on long-standing principles of Colorado water law, belong to the river. *See Ready Mixed Concrete,* 115 P.3d at 643; *Shelton Farms,* 187 Colo. at 187, 529 P.2d at 1325; *Comstock,* 55 Colo. at 256–57, 133 P. at 1111. If the water court were to base replacement obligations on present hydrological conditions in the basin, WAS would be given the benefit of out-of-priority pumping of seepage and return flow waters that belong to the South Platte River. The requirement that WAS base re-

placement obligations on the assumption that Box Elder Creek is a live stream prevents *continued* out-of-priority pumping of return flows and seepage water.

■ In *Ready Mixed Concrete,* citing *Comstock,* this court held that return flows "cannot be lawfully diverted from their course ... by independent appropriation, to the injury of those having decreed priorities therefrom." 115 P.3d at 643 (internal quotations omitted). Water does not become nontributary or otherwise exempt from the priority system simply because it is diverted before it reaches a stream. *See Peterson v. Reed,* 149 Colo. 573, 577–78, 369 P.2d 981, 984 (1962); *Comstock,* 55 Colo. at 245, 133 P. at 1111 ("If such an act of capture and diversion can be upheld as lawful and proper, by the same reasoning a new claimant could divert the waters of a surface tributary, if he only be spry enough to capture and divert them before they actually reach and mingle with the waters of the main stream.").

■ Accordingly, as the water court held, Colorado law does not permit wells to pump voraciously until the connection between the aquifer and the surface system is broken and thereby establish nontributary rights free from the call of the river. Instead, Colorado law absolutely protects senior rights from injury by junior rights and mandates that augmentation plan applicants replace 100% of their out-of-priority depletions. Here, those out-of-priority depletions are made up of approximately 14,000 acre feet of return flows and seepage water annually.

Therefore, the water court's order does not require WAS to account for all historic depletions. It merely requires WAS to assume that a live stream exists in Box Elder Creek, and provide replacement water based on the assumption that such water will reach the South Platte River, i.e., the assumption that wells in the Box Elder Creek basin are tributary. The water court did not include this term to account for previous interception of return flows and seepage water by wells in the Box Elder Creek basin. Rather, the water court included this term in order to ensure that, under the WAS augmentation

---

**4.** WAS proposed to lag depletions to the South Platte River rather than Box Elder Creek itself.

plan, wells will not intercept return flows and seepage water that rightfully belong to the river in the *future*. This requirement is consistent with the fundamental requirement that junior appropriators may not intercept return flows and seepage water if such interception will harm senior water rights.

## C. Well Call

WAS asks this court to opine on whether the Division and State Engineers have the discretionary authority to implement a "well call" system in the absence of a decree term. Finding that the proposed system suffered from both factual and legal problems, the water court declined to include the "well call" provision in the decree. On appeal, WAS neither challenges the factual findings of the water court nor seeks an additional decree term mandating use of the "well call" system. Rather, WAS asks this court to issue an opinion discussing whether the State and Division Engineers have the authority to implement a "well call" at some point in the future. Because such an opinion would be purely advisory and based on a hypothetical set of facts, we decline to address the matter.

The duty of courts is to "decide actual controversies by a judgment which can be carried into effect, not to declare principles or rules of law" which cannot affect the matter at issue before the court. *Barnes v. Dist. Ct.*, 199 Colo. 310, 312, 607 P.2d 1008, 1009 (1980)(internal quotations omitted); *see also Crowe v. Wheeler*, 165 Colo. 289, 294, 439 P.2d 50, 52–53 (1968). In exercising our jurisdiction, we limit our "inquiry to the resolution of actual controversies based on real facts." *Bd. of Dirs., Metro Wastewater Reclamation Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 105 P.3d 653, 656 (Colo.2005). The mere possibility of a future claim is not an appropriate predicate for exercise of judicial power. *Id.*

Here, the water court declined to include WAS's proposed "well call" decree term. As such, were we to issue an opinion on the subject, it would be advisory as the issue is not yet ripe for judicial resolution. Therefore, we decline to address whether the Division and State Engineers have the discre-tionary authority to implement a "well call" system in the absence of a decree term.

## D. Substitute Water Supply Plans

WAS wells operated under substitute water supply plans approved by the State Engineer pursuant to section 37–92–308(4) during 2003, 2004, and 2005. Several Opposers challenged the State Engineer's approval of the 2003 and 2004 SWSPs, and the SWSP appeals were consolidated with the underlying augmentation plan application, as required by section 37–92–308(4). Prior to hearing the appeal, the water court issued an order finding that the standard of review applicable to appeals from the State Engineer's approval or denial of SWSPs is de novo. However, because WAS agreed to voluntarily curtail all out-of-priority depletions until the water court issued the final decree, the water court did not hear the SWSP appeals prior to ruling on the augmentation plan application.

WAS and the State and Division Engineers argue the water court erred in holding that section 37–92–308(4) SWSPs are reviewed under a de novo standard. They argue that section 37–92–308(4) SWSP appeals should be reviewed under the standard of review set forth in the Colorado Administrative Procedure Act ("APA"). § 24–4–106. Certain Opposers counter that, in this case, the SWSP issue is moot, and we therefore should not address the matter. They also argue that, should we choose to address the merits of the SWSP issue, the water court was correct in holding that the proper standard of review is de novo.

We agree with the Opposers who argue that the SWSP issue is moot; however, we nonetheless choose to address the issue under our exception to the mootness doctrine applicable to issues that are capable of repetition, yet evade review. As to the standard of review applicable to section 37–92–308(4) SWSP appeals, we hold that, although section 37–92–308 employs varying language for appeals from different types of SWSPs, based on the plain language of section 37–92–308(4), such appeals should be reviewed pursuant to the standard of review

set forth in the Colorado APA. We address each issue in turn below.

In 2002, the General Assembly enacted section 37–92–308, which grants the State Engineer the authority to review and approve SWSPs in a number of different factual situations. *Bijou Irrigation Co.*, 69 P.3d at 62–63. Under subsection (4), applicable to the SWSPs at issue here, when an applicant has filed an application with the water court for approval of an augmentation plan "and the court has not issued a decree, the State Engineer may approve the temporary operation of such plan . . . ." § 37–92–308(4). The SWSP is operational for one year, and approval is available annually for up to three years, with a showing of justifiable delay necessary for extensions beyond three years. *Id.* Parties may appeal the State Engineer's decisions regarding applications for SWSPs to the water court in the applicable water division. *Id.*

In the case of section 37–92–308(4) SWSP appeals, which are only in effect for one-year periods, once the year expires, the SWSP appeal becomes moot and evades review by both the water court and this court. Further, in almost every case, the SWSP appeal will be superseded by a ruling on the underlying plan for augmentation. Appellate review of the State Engineer's SWSP decisions are proceedings limited to the appeal of the SWSP itself, and have no effect beyond the SWSP. The review is limited to the propriety of the SWSP, and, once the one-year SWSP operational period is over, any injury cannot be addressed in review of the SWSP because the SWSP cannot be modified retroactively. Therefore, after expiration of one year, any injury that results from operation of a section 37–92–308(4) SWSP can only be considered in a proceeding other than review of the SWSP pursuant to section 37–92–308(4).

Accordingly, because of the short timeframe associated with SWSP appeals, and the fact that there is no remedy for opposers of SWSPs to pursue other than appeal to the water court, the question of the proper standard of review may continue to evade review by this court despite arising regularly in the water courts in the future. Therefore, we exercise jurisdiction under the exception to the mootness doctrine applicable to issues that are capable of repetition, yet evade review. *Trinidad Sch. Dist. No. 1 v. Lopez*, 963 P.2d 1095, 1102 (Colo.1998); *see also Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)(the capable of repetition, yet evading review exception to the mootness doctrine limited to situations where the challenged action is too short in its duration to be fully litigated prior to its cessation or expiration).

 We now turn to the merits of the issue of the proper standard of review to apply to section 37–92–308(4) SWSPs. Pursuant to section 24–4–107, C.R.S. (2009), the APA applies to every agency of the state having statewide territorial jurisdiction. The APA serves as a gap-filler, and its provisions apply to agency actions unless they conflict with a specific provision of the agency's statute or another statutory provision preempts the provisions of the APA. *See Colo. Ground Water Comm'n v. Eagle Peak Farms, Ltd.*, 919 P.2d 212, 216 (Colo.1996). Accordingly, the State Engineer's approval or denial of a SWSP constitutes an agency action, review of which is governed by the APA unless the APA conflicts with a specific statutory provision. *See* § 24–4–102(1), (3) (defining "agency" and "action").

APA section 24–4–106 governs judicial review of agency actions and provides the standards for judicial review of the agency action unless a specific statutory provision conflicts with it. *See* § 37–90–115, C.R.S. (2009)(explicitly mandating de novo review of all non-rulemaking Ground Water Commission decisions related to Article 90 of Title 37, C.R.S. (2009) and decisions of the State Engineer under section 37–90–110, C.R.S. (2009)); *Eagle Peak Farms, Ltd.*, 919 P.2d at 216 (requiring APA review of Ground Water Commission and State Engineer rulemaking decisions in the context of designated groundwater). Section 24–4–106(7) provides that, in reviewing an agency action, a court shall affirm the agency decision unless it finds that the agency action is, among other things, "arbitrary and capricious, . . . an abuse or clearly unwarranted exercise of discretion, [or] based upon findings of fact that are clearly erroneous . . . when the rec-

ord is considered as a whole...." APA review is consistently applied as highly deferential to the acting administrative agency. *See, e.g., Bd. of Assessment Appeals v. Colo. Arlberg Club,* 762 P.2d 146, 151 (Colo.1988); *Colo. Mun. League v. Mountain States Tel. & Tel. Co.,* 759 P.2d 40, 44 (Colo.1988); *City and County of Denver v. Bd. of Assessment Appeals,* 802 P.2d 1109, 1111 (Colo.App. 1990).

■ Because the judicial review standards set forth in the APA apply to decisions of the State Engineer unless they conflict with a specific statutory provision, the question before us is whether section 37–92–308(4)(c),[5] governing appeal of subsection (4) SWSPs, conflicts with APA review as outlined in section 24–4–106. For the reasons discussed below, we hold that it does not.

■ In order to determine whether section 37–92–308(4)(c) conflicts with APA review under section 24–4–106, we must begin our analysis with the plain language of section 37–92–308(4)(c). Statutory interpretation is a question of law subject to de novo review. *Klinger v. Adams County Sch. Dist. No. 50,* 130 P.3d 1027, 1031 (Colo.2006). A reviewing court begins the analysis with the plain language of the statute. The statute should be construed as a whole, "giving consistent, harmonious, and sensible effect to all of its parts." *Cooper v. People,* 973 P.2d 1234, 1239 (Colo.1999). If the statute is clear and unambiguous on its face, then the court need look no further. *People v. Luther,* 58 P.3d 1013, 1015 (Colo.2002). If the statute is ambiguous, the court looks to the statute's legislative history, the consequences of a given construction, and the overall goal of the statutory scheme to determine the proper interpretation of the statute. *People v. Cooper,* 27 P.3d 348, 354 (Colo.2001).

Section 37–92–308 is a complex statute providing for SWSPs in a number of differ-

ent factual scenarios. Subsection (4), applicable here, applies to SWSPs when an augmentation plan application, rotational crop management contract, or change of water right application has been filed, but the court has not yet issued a decree. Subsection (3) allows parties in the South Platte River basin to obtain SWSPs during 2003, 2004, and 2005 if they operated SWSPs approved by the State Engineer prior to 2003. Subsection (5) allows the State Engineer to approve, as SWSPs, out-of-priority diversions and changes of water rights not exceeding five years. Subsection (7) provides for emergency ninety-day SWSPs. Subsection (10) allows parties who have previously decreed augmentation plans to apply for SWSPs in order to provide temporary replacement augmentation water. Subsection (11) provides for SWSPs for coalbed methane wells drilled during 2010, 2011, and 2012.

Subsections (3) and (11) clearly designate a standard of review applicable to appeals of the State Engineer's approval or denial of subsection (3) and (11) SWSPs, stating "the water judge shall hear and determine such appeal using the procedures and standards set forth in sections 37–92–304 and 37–92–305 for determination of matters referred to the water judge by the referee." Section 37–92–304(3), C.R.S. (2009), requires that matters referred to the water judge by the referee shall be determined de novo. In contrast to subsections (3) and (11), subsection (4)(c) does not require that appeals to the water court be determined using the standards for water referee review. Instead, subsection (4)(c) simply states "Any appeal of a decision made by the state engineer concerning a substitute water supply plan pursuant to this subsection (4) shall be to the water judge of the applicable water division within thirty days and shall be consolidated with the application for approval of the plan for augmenta-

---

**5.** Section 37–92–308(4)(c) provides:

When the state engineer approves or denies a substitute water supply plan, the state engineer shall serve a copy of the decision on all parties to the pending water court application by first-class mail. Neither the approval nor the denial by the state engineer shall create any presumptions, shift the burden of proof, or serve as a defense in the pending water court case or

any other legal action that may be initiated concerning the substitute water supply plan. Any appeal of a decision made by the state engineer concerning a substitute water supply plan pursuant to this subsection (4) shall be to the water judge of the applicable water division within thirty days and shall be consolidated with the application for approval of the plan for augmentation.

tion." WAS and the State and Division Engineers argue that, because de novo referee review is provided for in certain subsections of section 37–92–308, but not subsection (4)(c), the General Assembly intended that a different standard of review apply to subsection (4) SWSPs. Accordingly, they argue that the operative language is the sentence in subsection (4)(c) quoted above stating that review is to the water court, and that, since it does not conflict with APA review, subsection (4) SWSPs should be reviewed under the APA.

Certain Opposers argue that, although subsection (4)(c) does not contain the reference to referee review contained in subsections (3) and (11), subsection (4)(c)'s language providing that "neither the approval nor the denial by the state engineer shall create any presumptions, shift the burden of proof, or serve as a defense in the pending case or in any legal action that may be initiated concerning the substitute water supply plan" means that appeals of subsection (4) SWSPs should nonetheless be reviewed de novo. Furthermore, the Opposers argue that, since subsections (10) and (11) provide for an expedited appeal, but subsection (4)(c) is silent as to the timeframe for appeal, we should infer that the General Assembly did not intend an expedited appeal but instead intended for the water court to conduct de novo review of subsection (4) SWSPs.

For the reasons stated below, we agree with WAS and the State and Division Engineers that the language controlling the nature of review for subsection (4) SWSPs is the provision stating that appeal is to the water court, which does not conflict with, and is therefore governed by, the APA standard of review. We do not agree with certain Opposers that the language providing that no presumptions are created and the burden does not shift addresses the standard of re-

view. Nor do we agree that the lack of a provision for expedited review implies that the standard of review is de novo.

■ When the General Assembly includes a provision in one section of a statute, but excludes the same provision from another section, we presume that the General Assembly did so purposefully. *See Romer v. Bd. of County Comm'rs of County of Pueblo*, 956 P.2d 566, 567 (Colo.1998)(absence of specific provisions or language in a statute "is not an error or omission, but a statement of legislative intent"); *Eagle Peak Farms, Ltd.*, 919 P.2d at 218. Here, the General Assembly chose to include a specific statement regarding the applicable standard of review in subsections (3) and (11), but did not include such a statement in subsection (4)(c). Based on our rules of statutory construction, we must presume that the General Assembly purposefully chose not to include the language contained in subsections (3) and (11) requiring de novo review in subsection (4)(c) because it intended that a different standard of review apply. Since no specific standard of review is provided for in subsection (4)(c), presumably, the General Assembly intended that appeals of subsection (4) SWSPs be conducted pursuant to the APA.

We find the argument that the language stating the State Engineer's SWSP decision does not create a presumption, shift the burden of proof, or provide a defense contained in subsection (4)(c) directs de novo review to be unpersuasive. All of the subsections in section 37–92–308 providing for SWSPs contain a version of the language from subsection (4)(c) providing that "neither the approval nor the denial by the state engineer shall create any presumptions, shift the burden of proof, or serve as a defense" in the pending case or in any legal action that may be initiated concerning the SWSP.[6] Even if this

---

6. The language providing that the State Engineer's decision shall create no presumptions or shift the burden of proof contained in each subsection differs slightly with regard to the type of proceeding to which the subsection pertains. For example, subsection (4), applicable here, states that neither the approval nor the denial by the State Engineer "shall create any presumptions, shift the burden of proof, or serve as a defense *in the pending water court case or any*

*other legal action that may be initiated concerning the SWSP."* Subsection (7), dealing with emergency ninety-day SWSPs, provides that neither the approval nor denial by the State Engineer "shall create any presumptions, shift the burden of proof, or be a defense in any legal action that may be initiated *concerning an emergency SWSP or in any proceeding under subsection (3) or (4) of this section."* Subsections (3), (5), and (10) each state that neither the approval nor denial by the

**420**

language, standing alone, could be read as requiring that the State Engineer's decision not create any presumptions, shift the burden of proof, or serve as a defense in the SWSP appeal, and thereby implies a de novo standard of review, we find that, when read in view of the entire statute, the General Assembly did not intend such a result. Instead, we find that this language is not a reference to the standard of review that should be applied to subsection (4) SWSP appeals, but rather to the fact that the State Engineer's decision should not affect the underlying augmentation plan case or collateral litigation related to the SWSP.

■ Subsections (3) and (11), which specifically mandate de novo review, include the language contained in subsection (4)(c) providing that neither the approval nor the denial of a SWSP by the State Engineer shall create any presumption, shift the burden of proof, or serve as a defense. If, as urged by certain Opposers, we were to find that this language required de novo review, it would be redundant for the General Assembly to also include the statement in subsections (3) and (11) that review is to be conducted de novo. When interpreting a statute, we must give meaning to all portions of the statute, and avoid a construction rendering any language meaningless. *Fabec v. Beck*, 922 P.2d 330, 337 (Colo.1996). We therefore reject the argument that subsection (4)(c)'s statement that the State Engineer's decision shall not create a presumption, shift the burden of proof, or provide a defense addresses the standard of review applicable to subsection (4) SWSPs.

While we can do no more than speculate as to why the General Assembly chose to specifically require de novo review of subsection (3) and (11) SWSPs, we presume that it did not include the language stating that the State Engineer's decision shall not create a presumption, shift the burden of proof, or provide a defense in subsections (3) and (11) as mere repetition. Instead, we find that subsection (4)(c)'s recitation of this language means that the State Engineer's SWSP deci-

sion shall not affect the water court's determination of proceedings other than the SWSP appeal, specifically, the underlying augmentation plan case. This language therefore provides that the fact the State Engineer has previously approved or denied the temporary operation of an un-ruled upon augmentation plan as a SWSP under subsection (4) cannot affect the underlying case. Therefore, for example, the State Engineer's approval of a subsection (4) SWSP does not shift the burden of proof in the augmentation plan case or create a presumption of its validity. Similarly, the State Engineer's denial of a subsection (4) SWSP cannot be used by opposers of an augmentation plan as a defense to the augmentation plan's approval. This reading of the language is consistent with the overall statutory scheme, and avoids a statutory construction that would render certain language superfluous.

We similarly reject the argument that, because subsection (4)(c) does not provide for expedited review, we should infer that review is to be conducted de novo. It is not clear from the plain language of section 37–92–308 why the General Assembly provided for expedited appeal of subsection (10) and (11) SWSPs, but not subsection (4) SWSPs. However, in other statutes, the legislature has called for expedited review not to change the applicable standard of review, but to ensure that courts speed review of these cases. See, e.g., § 16–12–101.5, C.R.S. (2009)("The general assembly urges the Colorado supreme court to adopt an expedited process to review class 1 felony convictions where the death penalty has been imposed.... It is the general assembly's intent that the Colorado supreme court give priority to cases in which a sentence of death has been imposed over other cases before the court...."); *In re Title, Ballot Title & Submission Clause & Summary for 1999–2000 No. 219*, 999 P.2d 819, 821 (sections 1–40–107(1) and 1–30–107(2) show that the General Assembly placed "great emphasis on expediting the review process" governing ballot initiatives). Consequently, here, we presume

State Engineer "shall create any presumptions, shift the burden of proof, or serve as a defense *in any legal action involving the SWSP*." (Emphasis

added to differentiate the language of each subsection.)

that an expedited appeal was included in (10) and (11) only to require the water court to advance the case on the calendar and not as a statement regarding the proper standard of review.

Accordingly, because we find that subsection (4)(c) does not provide a particular standard of review to apply to appeals of subsection (4) SWSPs, it does not conflict with APA section 24–4–106, and the standard of review applicable to subsection (4) SWSPs is therefore governed by the Colorado APA. Based on our canons of statutory construction and the plain language of the statute, we presume the General Assembly intended section 37–92–308(4) SWSPs to be reviewed under a standard different than that provided for in subsections (3) and (11) and did not fail to include language requiring de novo review, as it did with subsections (3) and (11), as an oversight. While this presumption is clear enough from the plain language of section 37–92–308 and our rules of statutory construction, it is less clear why the General Assembly chose to implement a scheme in section 37–92–308 under which certain SWSPs are reviewed under different standards than others. However, we cannot redraft the language of section 37–92–308. Therefore, we conclude that the legislature intended the standard of review applicable to section 37–92–308(4) SWSPs to be governed by the Colorado APA.

## IV. Conclusion

In sum, we affirm the water court's ruling that WAS must provide replacement water to account for pre–2003 post-pumping depletions that have a continuing effect on surface water conditions. Similarly, we affirm the water court's requirement that WAS base replacement obligations in the Box Elder Creek basin on hydrological conditions that would exist in the basin absent well pumping. Because an opinion on the "well call" issue would be advisory, we decline to address it in this appeal. Finally, although the SWSP issue is moot, we nonetheless address it under the exception to the mootness doctrine providing for review of issues that are capable of repetition, yet evade review. We hold that section 37–92–308(4) SWSP appeals

should be reviewed pursuant to the standard of review set forth in the Colorado Administrative Procedure Act. Accordingly, the judgment of the water court is affirmed in part and reversed in part.

Justice COATS concurs in part and dissents in part.

Justice EID does not participate.

Justice COATS, concurring in part and dissenting in part.

Although I largely agree with the remainder of the majority's analysis and conclusions, I would not affirm the water court's order conditioning the approval of an augmentation plan on the applicants' replacement of depletions that occurred before the plan was even applied for. Because I believe this order not only exceeds the water court's statutory authority but implicates important precepts of fundamental fairness, I briefly note my concerns.

Basically, the water court has denied a group of well owners the right to divert water out-of-priority unless they not only ensure that senior appropriators will not be injured by their proposed diversions but also replace water diverted through these same structures in the past without adequate, judicial authorization. Quite apart from the water court's clear lack of concern for the identity, much less culpability, of the well-owners responsible for prior depletions, the augmentation plan it fashions bears virtually no relation to the prevention of injury from the applicants' proposed diversions. And the majority's attempt to justify this condition on the basis of a few isolated words in the statutory scheme suffers, at least in my view, from the kind of myopic vision often characterized as failing to see the forest for the trees.

The statutory scheme requires that out-of-priority diversions by junior appropriators be permitted as long as they will not injure senior appropriators; and it sanctions augmentating the stream with additional water as one way of ensuring that out-of-priority diversions will not adversely affect the availability of water to satisfy more senior rights. Because ground water diversions may have

delayed effects, water courts are expressly admonished that they must include, as a condition of any augmentation plan, a requirement to replace even those depletions that will occur only after the proposed out-of-priority ground water diversions cease. *See* § 37–92–305(8), C.R.S. (2009). Similarly, because an applicant may be permitted to divert out of priority before its augmentation plan is finally approved, water courts are statutorily instructed to consider depletions from an applicant's "use or proposed use" in evaluating the feasibility of the applicant's plan. *See* § 37–92–308, C.R.S. (2009). But considered in context, the discretion of water courts relative to the approval or disapproval of augmentation plans is clearly limited to fashioning terms and conditions that will prevent injury to senior appropriators from the out-of-priority diversions for which augmentation is sought—not terms and conditions that will penalize applicants for diversions they may have made before ever becoming applicants for the augmentation plan in question, or terms that will compensate senior appropriators for injuries resulting from prior diversions, even if those injuries actually could be traced to the current applicant or its well.

The statutory scheme does, of course, contemplate and provide a mechanism to sanction the pumping of ground water without authorization, and it provides specific sanctions, like curtailment and the assessment of fines and costs, for doing so. *See* § 37–92–503, C.R.S. (2009); *see also Vaughn v. People ex rel. Simpson,* 135 P.3d 721 (Colo.2006)(action by state engineer to enjoin and sanction well-owner who failed to comply with order to discontinue diverting, following announcement of *Simpson v. Bijou Irr. Co.,* 69 P.3d 50 (Colo.2003)). Orders of this kind directed against individuals, however, are permissible only in statutory actions of a limited type, involving considerably more stringent process, with different standards of notice and proof, and an adequate opportunity to defend. *See Groundwater Appropriators of South Platte River Basin, Inc. v. City of Boulder,* 73 P.3d 22 (Colo.2003). In addition to the fact that there appears to be no dispute that any prior depletions by the applicants in this case were approved in advance by the state engineer, it is also clearly the case that denying junior appropriators the right to non-injurious, out-of-priority diversion unless they first replace prior depletions is not a statutorily approved sanction, even for violation of an express order of the state engineer not to pump. *See* § 37–92–503.

The distinction between an action to either enjoin or penalize unlawful pumping, on the one hand, and an application for permission to divert out-of-priority, on the other, is not merely technical. Perhaps in recognition of fundamental requirements of due process that must be satisfied before depriving someone of a property right, the majority apparently finds that the water court's order to replace prior depletions is actually an order directed at the particular structure or device (like a well or ditch) itself, rather than its owner; and therefore it is permissible upon compliance with only the looser requirements associated with *in rem* jurisdiction, made applicable by statute in this jurisdiction to applications for water rights. Aside from its affinity to the ancient practice of holding inanimate objects liable and subjecting them to forfeiture as punishment for causing accidental injuries, this hyper-technical fiction offers no legislative rationale for conditioning permission for out-of-priority diversions through a particular well or structure on that structure's "personal" history. It remains unclear to me whether this logic will now require applicants for water rights of all kinds to either discover and successfully defend the histories of the physical structures they intend to use or be required to pay off any "debt" to the stream found due and owing by such structures.

In short, I believe the majority conflates the purpose of augmentation, which is to offset any adverse effects of out-of-priority diversion that would otherwise be experienced by senior appropriators, with some intuitive, but not entirely clear or consistent, notion of equity. The water court's order in this case not only requires the applicants to provide replacement water for their proposed diversions, which would effectively leave senior appropriators in the same position as if the applicants proposed no further out-of-priority diversions or augmentation plan at all; but it

also requires them to replace water diverted years earlier, which will actually increase the availability of water for, and enhance the position of, senior appropriators.

The statutory standards governing the water court's order in this case simply do not permit it to condition approval of the applicants' augmentation plan on the provision of replacement water for depletions that occurred before the plan was ever applied for, whether or not those past depletions will continue to affect the river in the future. Perhaps this thinking represents a kind of rough frontier justice, of which the majority considers the courts to be the purveyors, but I fail to see how it can be justified in terms of the regulatory scheme promulgated by the General Assembly.

I therefore respectfully dissent from the majority's affirmance of this condition of the augmentation plan.