In re the **MARRIAGE OF Holly Budean WHITE, Appellee,**

and

**David D. MARTIN, Appellant.**

No. 09CA0596.

Colorado Court of Appeals, Div. VI.

June 10, 2010.

Beltz & West, P.C., Daniel A. West, Colorado Springs, Colorado, for Appellee.

The Law Office of Kelly A–R McCurley, Kelly A–R McCurley, Monument, Colorado, for Appellant.

Opinion by Judge CARPARELLI.

In this post-dissolution of marriage matter between David D. Martin (father) and Holly Budean White (mother), father appeals from the order modifying child support. We affirm, but do so based on an analysis different from that of the trial court.

## I. Introduction

When the parties' marriage was dissolved, their child lived primarily with mother, and the court ordered father to pay child support. In June 2007, when the child was nearly sixteen, mother agreed that the child could live primarily with father, and that he could stop paying child support. Father, in turn, agreed that mother would not pay child support, provided that the child continued to have overnight visits with mother.

However, in August 2008, father filed a motion to modify child support, asking that mother pay child support and contribute to the child's uninsured medical expenses. At the hearing on his motion, father asked the court to order that mother's obligation to pay child support began when the child began living primarily with him.

In pertinent part, the court found that the child lived primarily with father beginning in June 2007 and ordered mother to pay child support as of the date father filed his motion, August 2008. Father appeals the court's decision not to order mother to pay child support as of June 2007.

## II. Father's Contention and Our Conclusions

Father contends that, in accordance with section 14–10–122(5), C.R.S.2009, and the decision in *In re Marriage of Emerson*, 77 P.3d 923 (Colo.App.2003), the trial court was *required to* modify mother's child support obligation as of the date the parties allowed the child to move to father's residence.

We presume the General Assembly's intent is expressed in the words it used, and, therefore, apply the statute in accordance with the plain and ordinary meaning of its words and phrases. Discerning no ambiguity, we do not resort to principles of statutory construction. We conclude that, under the plain meaning of section 14–10–122(5), if a court modifies the provision for child support of the obligor under an existing child support order, it must modify that provision as of the date the parties allowed the child to move. Here, because mother was not the obligor under the existing child support order, section 14–10–122(1)(d), C.R.S.2009, prohibited the court

from ordering mother to pay child support installments accruing before father filed the motion for modification.

Unlike in *Emerson*, where a division of this court concluded that it would be illogical to interpret section 14–10–122(5) as allowing a period of time during which neither parent is paying child support for a minor child, we perceive no illogic and apply the statute as written. *See Am. Family Mut. Ins. Co. v. Murakami*, 169 P.3d 192, 193 (Colo.App. 2007) (the decision of one division of court of appeals does not bind another division).

## III. Preservation of Issue

We first reject mother's contention that father did not preserve this issue for appellate review.

■ In his motion to modify, father requested child support "pursuant to the Colorado Child Support Guidelines," and at the hearing, he explicitly asked that support be calculated retroactively to the date the child changed residences. We conclude that father adequately raised this issue in the trial court and, thus, preserved it for appellate review.

## IV. Standard of Review

■ An appellate court reviews de novo whether the trial court applied the correct legal standard when modifying child support pursuant to section 14–10–122, C.R.S.2009. *See In re Marriage of Schmedeman*, 190 P.3d 788, 792 (Colo.App.2008).

## V. Statutory Interpretation

■ Our primary task in applying a statute is to give effect to the intent of the General Assembly. *Williams v. Kunau*, 147 P.3d 33, 38 (Colo.2006). When reviewing any provision of a statute, we consider the statutory scheme as a whole to give consistent, harmonious, and sensible effect to all its parts, and give words and phrases their plain and ordinary meaning. In so doing, we also give meaning to all portions of the statute and avoid an interpretation or construction that would render any language meaningless. *Well Augmentation Subdistrict v. City of Aurora*, 221 P.3d 399, 420 (Colo.2009).

When the statutory language is plain and clear, we presume that the General Assembly meant what it said and apply the statute as written. *Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.*, 109 P.3d 585, 593 (Colo.2005).

■■■■ We resort to principles of statutory construction only when a statute is ambiguous. *Farmers Reservoir & Irrigation Co. v. City of Golden*, 113 P.3d 119, 130 (Colo.2005); *Bd. of County Comm'rs v. Costilla County Conservancy Dist.*, 88 P.3d 1188, 1192–93 (Colo.2004). A statute is ambiguous when the words chosen by the General Assembly are capable of two or more reasonable meanings that yield different results, or are not clear in their common understanding. *State v. Nieto*, 993 P.2d 493, 500–01 (Colo.2000). When a statute is ambiguous, the court may look to the consequences of the alternative meanings to determine the intention of the legislature. § 2–4–203(1)(e), C.R.S.2009. "A statutory interpretation leading to an illogical or absurd result will not be followed." *Frazier v. People*, 90 P.3d 807, 811 (Colo.2004).

## VI. Modification of Child Support

Section 14–10–122 establishes procedures by which an existing child support order may be modified. Section 14–10–122(1)(a), (1)(c), and (1)(d) each state or refer to the general rule that the provisions of any decree regarding child support may be modified only as to installments accruing after the filing of the motion for modification. Each of these provisions also states that section 14–10–122(5) establishes an exception to this general rule.

Section 14–10–122(5) states that when a mutually agreed change of physical care occurs, "the provisions for child support *of the obligor under the existing child support order*, if modified pursuant to this section, *will be modified* as of the date when physical care was changed." (Emphasis added.) Like subsection (5), subsection (1)(c) also explicitly limits this retroactive modification of an existing child support order "to child support payable *by the obligor*." (Emphasis added.)

The General Assembly first added section 14–10–122(5) in 1991. At that time it read:

When a voluntary change of physical custody occurs, *the provisions for support*, if modified pursuant to this section, will be modified as of the date when physical custody was changed.

Ch. 42, sec. 8, § 14–10–122(5), 1991 Colo. Sess. Laws 253 (emphasis added). Thus, when the General Assembly first created this subsection, it permitted courts to modify the provisions for child support in an existing order as of the date when physical custody was changed. This provision did not explicitly limit modification of the existing child support order to the provisions for child support of the obligor.

However, in 1992, the General Assembly added section 14–10–122(1)(d), which then, as now, stated that, absent undue hardship or substantial injustice, if child support was modified the modification should be effective as of the date of the filing of the motion and "*[i]n no instance* shall the order be retroactively modified prior to the date of filing." Ch. 40, sec. 10, § 14–10–122(1)(d), 1992 Colo. Sess. Laws 203 (emphasis added).

In *In re Marriage of Pickering*, 967 P.2d 164, 166 (Colo.App.1997), a division of this court ruled that the requirement in section 14–10–122(5) that, if child support is modified, it must be modified as of the date when physical custody changed, conflicted with and could not be reconciled with the prohibition in section 14–10–122(1)(d) that in no instance could child support be retroactively modified before the date of filing. The division concluded that, as the later enactment, the prohibition in section 14–10–122(1)(d) controlled, and, by implication, repealed section 14–10–122(5).

Within eight months after *Pickering* was announced, the General Assembly amended section 14–10–122(5) to add the phrase at issue here: "the provisions for child support *of the obligor under the existing child support order.*" Ch. 215, sec. 14, § 14–10–122(5), 1998 Colo. Sess. Laws 765 (emphasis added). It also added references to the amended section 14–10–122(5) in section 14–10–122(1)(a), (1)(c), and (1)(d), thus making section 14–10–122(5) an exception to the general rule that modifications may not be retro-

actively modified to a date before the filing of the motion. *Id.* at 764–65.

Five years later, in *Emerson*, a division of this court concluded it would be illogical to interpret section 14–10–122(5) as limited to the child support obligations of the obligor under the existing order because it would allow "a lapse in support during a child's minority." 77 P.3d at 925. Because it believed it would be illogical and unconscionable for the statute to do so, the division held that "the burden of support, along with the identity of the obligor, 'shifted' when the children changed residences." *Id.* at 926. On these premises, the division concluded that the provision for child support in the existing order could be modified with regard to the parent who was not the obligor under the existing order as of the date when physical care was changed.

## VII. Analysis and Conclusions

■ Father contends that section 14–10–122(5) and *Emerson required* the court to order mother to pay child support as of the date the child's residence changed. He argues that the court "does not have discretion on this point." We agree that when there has been a mutually agreed change of physical care, if a court modifies the child support order, section 14–10–122(5) mandates that the provisions for child support of the obligor under the existing order "will be modified as of the date when physical care was changed," and that if the court modifies the order, it has no discretion to do otherwise. However, we conclude that the provision permits a court to modify only the child support of a parent who is the obligor under the existing child support order.

### A. Application of Section 14–10–122(5)

The general rule established in section 14–10–122(1) is that retroactive modification of child support orders should be effective as of the date of the filing of the motion to modify. Here, however, it is uncontroverted that there was a mutually agreed change of physical custody to father from mother.[1] Accordingly, departure from the general rule is controlled by section 14–10–122(1)(c) and (5).

In accordance with section 14–10–122(5), when there is a mutually agreed change of physical care, if a court modifies "the provisions for child support of the obligor under the existing child support order," it must do so as of the date when physical care was changed.

Here, it is undisputed that the child support order that was in effect when father filed his motion obligated father to make child support payments and did not obligate mother to do so.

Considering the statutory scheme as a whole; giving consistent, harmonious, and sensible effect to all its parts; giving words and phrases their plain and ordinary meaning; and presuming the General Assembly meant what it said, we conclude that father was the only "obligor under the existing child support order."

■ Thus, because the parties agreed to change physical care of the child to father and because father was the obligor under the existing order, the court could properly reduce or eliminate father's obligation to make child support payments retroactively to the date of the agreed change of custody. However, because the existing order did not obligate mother to make child support payments, she was not an obligor under it. Thus, as to mother the general rule of section 14–10–122(1) applied, and the court did not have discretion to retroactively modify mother's obligation to pay child support as of a date before father filed his motion.

### B. *Emerson*

Contrary to father's argument, we decline to apply the holding in *Emerson* because we do not perceive the phrase "the provisions for child support of the obligor in the existing child support order" to be ambiguous or il-

---

1. On and after February 1, 1999, the statutory terms "custody" and "custodial" were changed to "parental responsibilities." However, it was not the intent of the General Assembly to modify or change the meaning of the term "custody."

§ 14–10–103, C.R.S.2009. For clarity and ease of reference, this opinion uses the terms custody, custodial, and noncustodial, rather than cumbersome phrases that would have the same meaning but include the term "parental responsibilities."

logical. We conclude that the parameters established by the General Assembly for specific relief in the particular circumstances described in section 14–10–122(1)(d) and (e) are not logically inconsistent with a parent's continuing duty of support, and thus, must be applied as written.

### 1. The Duty of Support

 Children have an inherent right to support by their parents. *McQuade v. McQuade,* 145 Colo. 218, 220, 358 P.2d 470, 472 (1960). This right exists independently of the rights of the custodial parent and may be enforced in equity when there is no statute providing for relief in the particular circumstances. *Id.* This right gives rise to a concomitant continuing parental duty of support. *See, e.g., Abrams v. Connolly,* 781 P.2d 651, 656 (Colo.1989); *In re Marriage of Salas,* 868 P.2d 1180, 1181 (Colo.App.1994).

In Colorado, the Uniform Dissolution of Marriage Act (UDMA), sections 14–10–101 to –133, C.R.S.2009, provides for the relief in particular circumstances to which the supreme court referred in *McQuade.* The UDMA establishes procedures and considerations to enable courts to determine specifically whether, when, and how much a parent should be required to pay to fulfill his or her duty of support. If a court properly applies the statutory provisions and issues an order that does not obligate a noncustodial parent to make child support payments, the statute establishes procedures to modify that order at a later time and specifies when the obligation to pay child support may begin.

Unlike the *Emerson* division, we perceive a difference between the continuing duty of parents to support their children and statutory provisions for specific relief in particular circumstances.

### 2. Termination of the General Parental Duty of Support

In *Emerson,* because the mother asserted that, under section 14–10–122(5), her child support obligation "terminate[d] for a time," the *Emerson* division addressed the general question of whether a parent's continuing duty to support his or her child can terminate before the minor child is emancipated or dies before his or her emancipation. *Emerson,* 77 P.3d at 925. Consistent with applicable law and policy, the *Emerson* division concluded that section 14–10–122(5) did not terminate the mother's duty to support her child. We agree with this conclusion. When a child support order does not require a parent to make current payments, it does not *terminate* that parent's continuing duty of child support.

However, we disagree with the division's further conclusion that, "[b]ecause child support cannot terminate until a child's emancipation, it would be illogical to read [section] 14–10–122(5) as allowing a lapse in support during a child's minority." *Id.* (citation omitted).

### 3. Specific Relief in Particular Circumstances

The General Assembly has exercised its power to provide specific relief in particular circumstances. The scope and extent of that relief is established in section 14–10–115, C.R.S.2009.

In accordance with section 14–10–115(2)(a), although both parents owe a continuing duty of support to a child of the marriage, courts have discretion to order either or both parents to pay an amount reasonable or necessary for the child's support.

Section 14–10–115(2)(b) establishes procedures and factors courts must consider when they exercise their discretion regarding the duty of support. Section 14–10–115(5) and (6) establish procedures for determining each parent's income and adjustments to gross income. And section 14–10–115(7) to (10) establish guidelines for computing the amount of child support to be paid. Section 14–10–115(7) requires courts to determine each parent's basic support obligation based on the schedule provided and each parent's adjusted gross income. Thus, in section 14–10–115, the General Assembly has established parameters within which a court can grant specific relief in particular circumstances.

### 4. We Decline to Apply the Holding in *Emerson*

We conclude it is possible to give meaning to the general provisions regarding parents' obligations to support their children and the specific parameters established in sections 14–10–115 and 14–10–122 affecting whether that obligation should result in a specific order to make child support payments, and, if so, how much and when. We perceive no illogic in interpreting these provisions according to the plain meaning of the words and phrases chosen by the General Assembly.

The general provisions of section 14–10–115(2)(a) that all parents have a child support obligation can be given effect without rendering meaningless the specific limitations provided in sections 14–10–115 and 14–10–122(1). In like manner, the general provisions of sections 14–10–115 and 14–10–122(1) can be given effect without rendering meaningless the specific limitations established in section 14–10–122(5) and (1)(c) regarding retroactive modification of provisions for child support of the obligor under an existing child support order.

A custodial parent provides shelter, food, and other necessities for the child, and, depending on the considerations and procedures provided in section 14–10–115, the noncustodial parent may be ordered and, thus, obligated, to make payments to the custodial parent to participate in paying those expenses. The noncustodial parent is the obligor under such an order.

When a noncustodial parent takes custody of the child, the parent who gives up custody no longer incurs expenses associated with custody. In these circumstances, section 14–10–122(5) permits the court to retroactively modify the provisions for the child support of the obligor in the existing order as of the date of the change of custody to ensure that the parent who gives up custody does not receive a windfall.

At the same time, section 14–10–122(1) gives the parent who assumes custody the right and the choice to file a motion to modify his or her existing obligation and to require the other parent to begin paying child support. Indeed, that parent may file such a motion immediately upon the change of custody and, thereby, obtain an order granting child support payments as of that date. The parent also has the right and the choice to postpone filing such a motion. To the extent that he or she chooses to do so, section 14–10–122(1) acts to his or her detriment with regard to receiving child support payments to offset his or her custodial expenses. This is a logical allocation of responsibilities and consequences related to the filing of motions for modification of child support orders.

### C. Conclusion

In these circumstances, it is beyond the authority of this court to ignore the plain meaning of the General Assembly's words. In our view, the word "obligor" and the phrase "the provisions for child support of the obligor under the existing child support order," as used in section 14–10–122(5), are unambiguous and must be applied according to their plain and ordinary meaning. Section 14–10–122(5) does not refer to or terminate the continuing parental duty of support. Instead, it pertains to the specific relief established in the existing order directing one parent to make child support payments in a specified amount.

Not only is the plain and ordinary meaning of the phrase "child support of the obligor under the existing order" clear, but the speed with which the General Assembly acted to revise section 14–10–122(5) after the *Pickering* decision strongly suggests that it was reacting to the holding in *Pickering*. Rather than revising section 14–10–122(1)(d) and explicitly stating that section 14–10–122(1)(d) did not repeal section 14–10–122(5), it revised section 14–10–122(5).

If the General Assembly had intended section 14–10–122(5) to shift the burden of paying child support, as the *Emerson* division concluded, it could have re-enacted the 1991 version of section 14–10–122(5) and refrained from adding the reference to the obligor there and in section 14–10–122(1)(c), thereby making the re-enacted version of section 14–10–122(5) the later enacted and controlling provision. But it did not. Nonetheless, the *Emerson* division, in effect, held that the

revised section 14–10–122(5) had the same meaning as the 1991 version notwithstanding the addition of the phrase "the provisions for child support of the obligor under the existing child support order." In so doing, it rendered that phrase meaningless.

Accordingly, we conclude that the court did not err when it did not order mother to pay child support retroactively to the date of the change of custody.

## VIII. Sufficiency of the Record

Because our analysis is based on interpretation of section 14–10–122, and not on the trial court's factual findings, we need not reach mother's contention that father has submitted an insufficient record.

The order is affirmed.

Judge BERNARD concurs.

Judge LOEB specially concurs.

Judge LOEB specially concurring.

I agree with the result reached by the majority in this case, affirming the trial court's order that mother should pay child support retroactively to the date father filed his motion to modify in August 2008. However, I reach that result based on reasoning different from that employed by the majority.

In rejecting father's contention that the trial court erred by not ordering mother to pay child support retroactive to the date the parties allowed their child to move to father's residence, the majority engages in a well articulated and straightforward plain language statutory interpretation of the pertinent statutory framework. In so doing, the majority expressly declines to follow the reasoning and statutory analysis of another division of this court in *In re Marriage of Emerson*, 77 P.3d 923 (Colo.App.2003).

In my view, it is not necessary to interpret the statutory framework at issue here as does the majority to affirm the trial court's order. Rather, even assuming the reasoning in *Emerson* applies here, I believe the record as a whole, including the trial court's very detailed findings, supports the conclusion that the court did not abuse its discretion in ordering mother to pay child support to father retroactively to the date of father's motion to modify.

The underlying premise for the *Emerson* division's reasoning and holding is that both parents always have a duty to provide continuing support to their children in order to prevent a lapse in support. *See Emerson*, 77 P.3d at 925. Thus, the division interpreted section 14–10–122(5), C.R.S.2009, to mean that, in general, the burden of support, along with the identity of the obligor, shifts when children change residences from one parent to the other. *Emerson*, 77 P.3d at 926.

Here, the record is undisputed that there was no lapse in financial support for the child's needs during the time before father filed his motion. Rather, the record shows (and the trial court found) that while the child resided with mother, father paid all appropriate child support; that in June 2007, the parties orally agreed the child would live primarily with father; that the parties further agreed father could stop paying child support to mother at that time, but that, given his level of income, he would continue to support the child as he had before; and that they agreed mother would not have to pay child support to father, provided the child had overnight visits with mother.

When father filed his motion to modify in August 2008, mother responded by arguing she had no duty to pay child support because of her financial situation and because the parties had agreed in June 2007 that she did not have to pay child support. After holding an evidentiary hearing and reviewing substantial evidence concerning the income and financial circumstances of both parties, the court rejected mother's argument that she had no duty to pay child support. Indeed, the court expressly said that it would not enforce the parties' oral agreement that mother would not have to pay child support. In that regard, the court found with record support that mother had the capacity to earn a substantially greater income than she was currently earning from her temporary employment, although the court recognized that mother might need some amount of time to reach that level of income. However, the

court found that it would be "unfair" for father "to wait for a very long period of time and then file to modify child support and leave [mother] owing a very large sum." Rather, considering all of the evidence before it, including the parties' respective incomes and financial resources and father's delay in filing his motion to modify child support, the court found that the fair and equitable result here would be to order mother to begin paying child support as of the date of father's motion. The court then set mother's monetary support obligation at $512.18 commencing in August 2008 and ordered the child support amount for 2009 to be increased to $530.37 per month.

I discern nothing in *Emerson* that would preclude the result reached by the trial court here. Rather, I think it is a fair reading of the record that the trial court concluded that when the primary residence of the child changed in June 2007, from a legal standpoint, mother became the obligor for child support purposes at that point in time. *See id.* at 925–26. However, the trial court also concluded that, based on equitable considerations, it was within its discretion to determine that mother's monetary support obligation would be calculated at zero from June 2007 until the date of father's motion, when she would begin paying child support in the amounts referenced above. And, indeed, the court's findings support this determination, including mother's significant potential income level, father's substantial income, the fact that father waited "a very long time" to request child support, and the fact that full support for the child never lapsed. *See* § 14–10–115(8)(e), C.R.S.2009 ("Courts may deviate from the guidelines and schedule of basic child support obligations where its application would be inequitable, unjust, or inappropriate."); *In re Marriage of Haddad,* 93 P.3d 617, 620 (Colo.App.2004) ("Special considerations of an equitable nature arise in the domestic relations field. District courts necessarily are vested with discretion to achieve fair results under a wide variety of circumstances, attending always to the interests of the children." (citation omitted)).

In sum, the record here shows that the trial court did not abuse its very broad dis-cretion to reach a fair and equitable result regarding mother's obligation to pay child support even under the division's reasoning in *Emerson.*

Accordingly, I agree with the majority that the trial court's order should be affirmed. I reach that outcome, however, without revisiting and disagreeing with the analysis in *Emerson.* Nonetheless, because two divisions of this court have arrived at conflicting conclusions regarding the interpretation of section 14–10–122(5), it would now be appropriate for either the General Assembly or our supreme court to resolve the conflict.